1  IRELL & MANELLA LLP
   John C. Hueston (164921)
2  1800 Avenue of the Stars, Suite 900
   Los Angeles, CA  90067
3  Telephone:   (310) 277-1010
   Facsimile:    (310) 203-7199
4  jhueston@irell.com

5
   Attorneys for Plaintiff State
6  Compensation Insurance Fund

7

8                  UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11 STATE COMPENSATION INSURANCE        )  Case No.
   FUND,                               )
12          Plaintiffs,                )
                                       )
13      vs.                            )  **COMPLAINT FOR: VIOLATION OF THE**
                                       )  **FEDERAL SECURITIES LAWS,**
14 RICHARD S. FULD, CHRISTOPHER M.     )  **CALIFORNIA SECURITIES LAWS, AND**
   O'MEARA, ERIN M. CALLAN, MICHAEL    )  **COMMON LAW FRAUD**
15 L. AINSLIE, JOHN F. AKERS, ROGER S. )
   BERLIND, THOMAS H. CRUIKSHANK,      )
16 MARSHA JOHNSON EVANS, SIR           )
   CHRISTOPHER GENT, ROLAND A.         )
17 HERNANDEZ, HENRY KAUFMAN, JOHN      )
   D. MACOMBER, ANZ SECURITIES, INC.,  )
18 BBVA SECURITIES, INC., CABRERA      )
   CAPITAL MARKETS, LLC, CITIGROUP     )
19 GLOBAL MARKETS INC., DAIWA          )
   SECURITIES SMBC EUROPE, DZ          )
20 FINANCIAL MARKETS, HARRIS           )
   NESBITT, MELLON FINANCIAL           )  DEMAND FOR JURY TRIAL
21 MARKETS, LLC, MIZUHO SECURITIES     )
   USA INC., SCOTIA CAPITAL, SOVEREIGN )
22 SECURITIES CORPORATION, LLC,        )
   SUNTRUST ROBINSON HUMPHREY,         )
23 UTENDAHL CAPITAL PARTNERS, L.P.,    )
   WELLS FARGO SECURITIES; BNP         )
24 PARIBAS S.A.; FORTIS SECURITIES LLC;)
   ING FINANCIAL MARKETS LLC; M.R.     )
25 BEAL & COMPANY; SG AMERICAS         )
   SECURITIES, LLC; COMMERZBANK        )
26 CORPORATES & MARKETS; NATIXIS       )
   BLEICHROEDER INC.                   )
27                                     )
              Defendants.
28

FILED

MAY 16 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

EMC

CV 11 2400

IRELL & MANELLA LLP

**INTRODUCTION**

1.     State Compensation Insurance Fund ("State Fund") brings this action to recover losses sustained on its investments in medium-term notes issued by Lehman Brothers Holdings Inc. ("Lehman" or the "Company") in 2004 through 2008.[1]  State Fund purchased the relevant notes pursuant and/or traceable to three separate registration statements.

2.     The notes purchased by State Fund on September 24, 2007 and January 25, 2008 (the "2007 Notes" and "2008 Notes," respectively) were acquired pursuant and/or traceable to the Company's false and misleading registration statement and prospectus, dated May 30, 2006, and filed with the Securities and Exchange Commission ("SEC") on Form S-3, issued in connection with the Company's shelf registration or continuous offering process (the "Shelf Registration Statement").  The Shelf Registration Statement, together with the relevant prospectus, prospectus supplement, and pricing supplement, as well as all SEC filings incorporated therein, are collectively referred to herein as the "2007 and 2008 Offering Materials."   State Fund is seeking to recover its losses on the 2007 and 2008 Notes under the Securities Act of 1933 ("1933 Act"), the Securities Exchange Act of 1934 ("1934 Act"), California securities law, and common law. These claims are asserted against certain of Lehman's officers and/or directors and the underwriters who made materially false and misleading statements during the relevant period in press releases, analyst conference calls and filings with the SEC.

3.     Prior to the May 2006 Shelf Registration, State Fund purchased other Lehman medium-term notes in 2004, 2005 and 2006 pursuant and/or traceable to registration statements and prospectuses filed in May 2001 and May 2005.  The notes purchased on November 2, 2004, December 16, 2004 and February 10, 2005, all issued pursuant to Lehman's May 2001 registration statement, are collectively referred to herein as the "2005 Notes."  The notes purchased by State Fund on  February 6, 2006 pursuant to the May 2005 registration statement are collectively referred to herein as the "2006 Notes."  State Fund asserts common law fraud claims to recover

---

[1] Lehman is not a defendant in this lawsuit due to its filing, on September 15, 2008, for bankruptcy protection under Chapter 11 of the Bankruptcy Code.  Similarly, Lehman Brothers, Inc. ("LBI") is not a defendant in this lawsuit due to its forced dissolution on September 19, 2008. LBI was wholly owned by Lehman and was Lehman's primary broker-dealer subsidiary.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 1 -

COMPLAINTS

1   losses suffered on its 2005 and 2006 Notes against Lehman's officers ("Officer Defendants") who

2   knowingly, and with the intent to induce prospective investors' reliance, made materially false and

3   misleading statements in press releases, analyst conference calls and filings with the SEC.

4          4.     Between 2004 and 2008, Lehman and its bankers raised billions of dollars in

5   several offerings of investment-grade rated notes by means of false and misleading registration

6   statements, prospectuses, prospectus supplements, pricing supplements, and other SEC filings.  As

7   set forth herein, the offering documents that were filed in connection with the offerings at issue, as

8   well as other SEC filings incorporated therein, failed to disclose the true financial condition and

9   performance of the Company.  Specifically, the documents failed to disclose Lehman's losses and

10  exposure in connection with its subprime and Alt-A lending activities and the true value of the

11  Company's mortgage-related assets.  The Defendants' public statements, incorporated into its

12  offering documents, further failed to disclose the risks associated with Lehman's substantial

13  increase in its use of leverage.  Lehman's executives also made materially false statements about

14  its financial condition causing Lehman's note prices to be artificially inflated, and failed to

15  disclose that Lehman had engaged in manipulative quarter-end transactions called "Repo 105"

16  transactions that hid billions of dollars of Lehman's debt from the public.  When Lehman's losses

17  and exposure came to light, the revelations led to severe declines in the market value of Lehman's

18  notes and ultimately to its bankruptcy.

19                              **OVERVIEW**

20         5.     Prior to its bankruptcy filing, Lehman provided various financial services to

21  corporations, governments and municipalities, institutions and high-net-worth individuals

22  worldwide, including equity and fixed income sales, trading and research, investment banking,

23  asset management, private investment management and private equity.

24         6.     From 1994 to 2006, at the direction of defendant Richard S. Fuld, Jr. ("Fuld"),

25  Lehman became increasingly involved in the mortgage market and securitizing mortgage-related

26  products.  Furthermore, at the direction of defendant Fuld, Lehman dramatically increased its use

27  of leverage to fund its real estate investment activities from 2004 to 2007.  As a result, Lehman's

28  revenue and earnings grew at an impressive rate.  Lehman engaged in securitizing mortgage-

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 2 -

COMPLAINT

backed securities, becoming one of the largest issuers of mortgage-backed securities by the early 2000s. Mortgage-backed securities are created by purchasing mortgages and repackaging pools of mortgages into new securities. The new securities are divided into different types of tranches or slices classified by varying levels of credit risk and sold to investors. Lehman marketed and sold its mortgage-backed securities to large pension funds and other financial institutions.

7. The demand for mortgage-related securitized transactions grew substantially from 1994 to 2005, generating a great deal of revenue for Lehman. In order to fuel the demand for its securitization transactions, Lehman purchased two mortgage lenders, BNC Mortgage ("BNC") and Aurora Loan Services LLC ("Aurora"). BNC specialized in the subprime mortgage market while Aurora specialized in the Alt-A market. An Alt-A mortgage or Alternate A-paper is a type of mortgage where the risk profile falls between prime and subprime. An Alt-A borrower has a credit score above subprime but the mortgage generally has some issues that increase its risk profile, such as higher loan-to-value or debt-to-income ratios or inadequate documentation of the borrower's income. Both BNC and Aurora engaged in risky lending practices in order to generate a greater number of loans for Lehman to purchase and securitize.

8. The offering documents, including Lehman's Form 10-Ks and 10-Qs incorporated therein, failed to adequately disclose Lehman's aggressive mortgage lending activities and the risks surrounding these activities, including failing to adequately discuss Lehman's relationship with its mortgage originators, such as BNC and Aurora. The offering documents further failed to properly value Lehman's mortgage-related assets or to provide proper risk disclosures concerning Lehman's mortgage-related exposure. Additionally, the offering documents failed to provide adequate disclosures regarding the risks associated with Lehman's increased dependence on leverage to fund its real estate investment activities. The offering documents further provided false assurances that Lehman was properly engaging in risk management strategies to minimize its real estate-related risks.

9. Throughout fiscal years 2004, 2005, 2006, 2007, and 2008, Defendants continued to issue false and defective statements concerning Lehman's operations and its accounting for its real estate-related assets. The Officer Defendants further downplayed Lehman's exposure to risky

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 3 -
COMPLAINT

1    real estate assets and its leverage exposure.  In the meantime, Lehman was engaged at quarter end

2    in an accounting gimmick called Repo 105 in which billions of dollars of debt was temporarily

3    removed from Lehman's books and then reinstated following quarter end.  Internal emails at

4    Lehman referred to this practice as basically "window dressing."

5        10.      On September 10, 2008, Lehman pre-released its results for the third quarter of

6    2008, reporting a net loss of $3.9 billion and $7.8 billion in write-downs, which included $7

7    billion on its residential and commercial real estate holdings.  Four days later, Lehman filed the

8    largest bankruptcy in U.S. history.

9        11.      The value of Lehman's securities collapsed.

10       12.      On October 6, 2008, the Committee on Oversight and Government Reform held

11    hearings to determine the causes and effects of Lehman's bankruptcy.

12       13.      Further in October 2008, three separate criminal investigations were launched by

13    the U.S. Attorney's offices in the Eastern and Southern Districts of New York as well as the

14    District of New Jersey into the events surrounding the collapse of Lehman and whether the

15    Company and its executives misled investors, including whether Lehman valued its assets at

16    artificially high levels.

17       14.      The Bankruptcy Court-appointed examiner, Anton R. Valukas (the "Examiner"),

18    later testified before the House Committee on Financial Services that "the public did not know

19    there were holes in the reported liquidity pool, nor did it know that Lehman's risk controls were

20    being ignored, or that reported leverage numbers were artificially deflated.  Billions of Lehman

21    shares traded on misinformation."

22       15.      The true facts, which were known by the Officer Defendants but concealed from

23    State Fund during the relevant period, were as follows:

24             (a)      Lehman's true exposure to risk from mortgage-related transactions and

25    assets was understated.

26             (b)      Lehman's subsidiaries, BNC and Aurora, were engaging in high-risk

27    residential mortgage lending practices, which resulted in mortgage loans that would be much more

28    likely to end up defaulting and causing losses.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

- 4 -

COMPLAINT

1            (c)    Lehman failed to properly mitigate the risks associated with Lehman's

2      mortgage financing activities.

3            (d)    Lehman violated Generally Accepted Accounting Principles ("GAAP") in

4      preparing and disseminating false and misleading financial statements with respect to its

5      accounting ) for mortgage-related assets.

6            (e)    Lehman was engaging in quarter-end accounting manipulations that

7      understated its debt in quarterly financial statements by billions of dollars.

8            (f)    The extent of Lehman's leverage exposure was misstated.

9            (g)    Lehman represented that all of Lehman's assets were presented at "fair

10     value." Lehman, however, failed to consider market information when valuing certain of its

11     commercial real estate assets, thereby materially overstating their value.

12           (h)    Lehman's internal controls were inadequate to prevent the Company from

13     engaging in risky lending practices.

14           (i)    The Company's capital base was not adequate enough to withstand the

15     significant deterioration in the real estate markets and, as a result, Lehman would be forced to file

16     for bankruptcy protection due to its subprime and Alt-A exposure.

17     **INTRADISTRICT ASSIGNMENT**

18         16.    A substantial part of the events or omissions which give rise to the claims in this

19     action occurred in the county of San Francisco, and as such this action is properly assigned to the

20     San Francisco division of this Court.

21     **JURISDICTION AND VENUE**

22         17.    This Court has jurisdiction over the subject matter of this action pursuant to §22 of

23     the 1933 Act, 15 U.S.C. §77v; §27 of the 1934 Act, 15 U.S.C. §78aa; and 28 U.S.C. §1331.

24         18.    Venue is proper in this District pursuant to §22 of the 1933 Act, 15 U.S.C. §77v;

25     §27 of the 1934 Act, 15 U.S.C. §78aa; and 28 U.S.C. §1391(b), (c), and (d).  Many of the acts and

26     transactions described herein, including the preparation and dissemination of materially false and

27     misleading public filings, occurred in this District.  At all times relevant, Lehman maintained

28     operations and offices in this District.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

19.     In connection with the acts alleged herein, defendants used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of national securities exchanges.

### PARTIES

20.     Established in 1914 by the state legislature, Plaintiff State Fund is California's largest provider of workers' compensation insurance, with approximately 180,000 policyholders, more than $1.6 billion in premium, and nearly $20 billion in assets. State Fund purchased Lehman securities as described below and was damaged thereby:

| CUSIP | Date Purchased | Description | Paid |
|---|---|---|---|
| 52517P-VV-0 | November 2, 2004<br>December 16, 2004<br>February 10, 2005 | Medium-Term Notes Due 2014 | $44,942,050 |
| 52517P-D6-5 | February 6, 2006 | Medium-Term Notes Due 2010 | $20,014,400 |
| 52517P-5X-5 | September 24, 2007 | Medium-Term Notes Due 2014 | $10,071,500 |
| 5252M0-BZ-9 | January 25, 2008 | Medium-Term Notes Due 2013 | $10,153,600 |

**Relevant Non-Parties**

21.     Lehman was a corporation organized under the laws of the state of Delaware with its headquarters located at 1271 Avenue of Americas, New York, New York.  Lehman operated as a global investment bank and purported to be "an innovator in global finance" with a "leadership position in equity and fixed income sales, trading and research."  On September 15, 2008, Lehman filed a voluntary petition for bankruptcy protection under Chapter 11 of the Bankruptcy Code.  For this reason, Lehman is not named as a defendant in this action.

22.     LBI, based in New York, New York, was a wholly-owned subsidiary of Lehman and operated as a registered broker-dealer under the 1934 Act.  LBI's services included brokerage, mergers and acquisitions and restructuring advice, debt and equity underwriting, market making, debt and equity research, and real estate and private equity investments.  On September 17, 2008, the Securities Investor Protection Corporation moved for an order commencing liquidation and protection under the automatic stay provisions of the Bankruptcy Code.  The Bankruptcy Court

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

1   granted the request on September 19, 2008.  For this reason, LBI is not named as a defendant in

2   this action.

3       23.     Conning Asset Management Company ("Conning") is a registered investment

4   adviser that provides portfolio management services to State Fund.  Conning served as the

5   investment adviser/portfolio manager during the relevant time period for State Fund's investment

6   accounts, with full investment authority and discretion consistent with State Fund's Investment

7   Guidelines.  Prior to purchasing the 2005, 2006, 2007, and 2008 Notes on State Fund's behalf,

8   Conning first read and relied upon available offering documents, SEC filings, analyst reports, and

9   credit rating agencies' reports concerning Lehman and/or the specific security.  In reliance on

10  Defendants' material misrepresentations and omissions, as described below, State Fund purchased

11  the 2005, 2006, 2007, and 2008 Notes and suffered substantial losses caused by Defendants'

12  conduct.

**Defendants**

14      24.     Defendant Fuld had served as the Chairman of the Board of Directors and Chief

15  Executive Officer ("CEO") of Lehman since 2000.  Fuld received $111.8 million from fiscal year

16  ("FY") 2003 to FY 2007 in salary, bonuses and restricted stock unit awards, including $3.75

17  million in salary, $36.9 million in bonuses and $71.2 million in restricted stock unit awards.

18  Fuld's bonus amount was a substantial portion of his compensation as it was nearly ten times his

19  base salary.  Additionally, Fuld received $190.8 million in insider trading proceeds from FY 2003

20  through FY 2007.  Fuld signed the 2006 Registration Statement.

21      25.     Defendant Christopher M. O'Meara ("O'Meara") served as the Company's Chief

22  Financial Officer ("CFO"), Controller and Executive Vice President from 2004 until December 1,

23  2007, when he assumed the role of Global Head of Risk Management.  O'Meara received $12.4

24  million from FY 2005 to FY 2007 in salary, bonuses and restricted stock unit awards, including

25  $600,000 in salary, $4.8 million in bonuses and $6.7 million in restricted stock unit awards.

26  O'Meara's bonus amount was a substantial portion of his compensation as it was eight times his

27  base salary.  Additionally, O'Meara received $1.2 million in insider trading proceeds from FY

28  2003 through FY 2007.  O'Meara signed the 2006 Registration Statement.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 7 -

COMPLAINT

26.     Defendant Erin M. Callan ("Callan") served as the Company's CFO, Controller and Executive Vice President from December 2007 until June 2008.  Callan resigned from the Company in July 2008.  Previously, Callan served in various positions at Lehma after joining the Company in 1995.

27.     Defendant Michael L. Ainslie ("Ainslie") was a director of Lehman during the relevant period.  Ainslie signed the 2006 Registration Statement.

28.     Defendant John F. Akers ("Akers") was a director of Lehman during the relevant period.  Akers signed the 2006 Registration Statement.

29.     Defendant Roger S. Berlind ("Berlind") was a director of Lehman during the relevant period.  Berlind signed the 2006 Registration Statement.

30.     Defendant Thomas H. Cruikshank ("Cruikshank") was a director of Lehman during the relevant period.  Cruikshank was also a director of LBI.  Cruikshank signed the 2006 Registration Statement.

31.     Defendant Marsha Johnson Evans ("Evans") was a director of Lehman during the relevant period.  Evans signed the 2006 Registration Statement.

32.     Defendant Sir Christopher Gent ("Gent") was a director of Lehman during the relevant period.  Gent signed the 2006 Registration Statement.

33.     Defendant Roland A. Hernandez ("Hernandez") was a director of Lehman during the relevant period.  Hernandez signed the 2006 Registration Statement.

34.     Defendant Henry Kaufman ("Kaufman") was a director of Lehman during the relevant period.  Defendant Kaufman signed the 2006 Registration Statement.

35.     Defendant John D. Macomber ("Macomber") was a director of Lehman from 1996 until Lehman's bankruptcy on September 15, 2008.  Defendant Macomber signed the 2006 Registration Statement.

36.     The defendants identified in ¶¶24-26 are referred to herein as the "Officer Defendants."

37.     The defendants identified in ¶¶24 and 27-35 are referred to herein as the "Director Defendants."

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 8 -
COMPLAINT

38.     Defendant Cabrera Capital Markets, LLC ("Cabrera") is an investment bank and full-service institutional brokerage firm which provides services worldwide to a substantial and diversified client base that includes financial institutions, unions, governments, corporations, hedge funds, and foundations/endowments.  Cabrera is based in Chicago, Illinois.  Cabrera was an underwriter of the 2007 Notes offering.

39.     Defendant BBVA Securities Inc. ("BBVA") is a security broker/dealer which provides securities brokerage and research services.  BBVA is based in New York, New York. BBVA was an underwriter of the 2007 and 2008 Notes offerings.

40.     Defendant Citigroup Global Markets Inc. ("CGMI") is a large integrated financial services institution that through subsidiaries and divisions provides commercial and investment banking services, commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities.  CGMI was an underwriter of the 2007 and 2008 Notes offering.

41.     Defendant SunTrust Robinson Humphrey ("SunTrust") is a full-service investment banking and capital markets company that provides capital raising, strategic advisory, risk management, and investment solutions to corporate clients across the nation.  SunTrust was an underwriter of the 2007 and 2008 Notes offerings.

42.     Defendant ANZ Securities, Inc. ("ANZ") is a boutique investment banking firm that offers financial advisory services.  The firm provides merger and acquisition, trade finance, export finance, structured finance, corporate banking, currency options, and structured credit derivatives.  ANZ operates as a subsidiary of ANZ Bank based in Melbourne, Australia.  ANZ is headquartered in New York, New York.  ANZ was an underwriter of the 2007 Notes offering.

43.     Defendant Mellon Financial Markets, LLC ("Mellon") is an investment banking and full-service securities dealer firm specializing in public finance, asset-backed finance and institutional sales, servicing hundreds of institutional client.  Mellon was an underwriter of the 2007 and 2008 Notes offerings.

44.     Defendant Wells Fargo Securities, LLC ("Wells Fargo") is an investment services division of Wells Fargo Bank.  Wells Fargo provides investment banking services in the United States and offers capital markets access through public offerings, private placements, and debt

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

1  offerings, which include new issue underwriting of high yield bonds and 144A private placements,

2  as well as market making, research, and equity trading. Wells Fargo also provides advisory

3  services for mergers and acquisitions. Wells Fargo was an underwriter of the 2007 and 2008

4  Notes offerings.

5       45.    Defendant Harris Nesbitt Corp. ("Harris Nesbitt") an investment bank, provides

6  investment and corporate banking services in the United States. It offers various financial

7  products aid services, including equity and debt underwriting, corporate lending and project

8  financing, merger and acquisitions advisory services, merchant banking, securitization, treasury

9  and market risk management, debt and equity research and institutional sales and trading. Harris

10  Nesbitt is headquartered in New York, New York. Harris Nesbitt was an underwriter of the 2007

11  Notes offering.

12       46.    Defendant DZ Financial Markets LLC ("DZ Financial") provides securities

13  brokerage and underwriting services and is based in New York, New York. DZ Financial was an

14  underwriter of the 2007 Notes offering.

15       47.    Defendant Mizuho Securities USA Inc. ("Mizuho") offers underwriting, sales and

16  trading of securities and is a financial derivatives brokerage. Mizuho is based in New York, New

17  York and operates as a subsidiary of Mizuho Securities Co., Ltd. Mizuho was an underwriter of

18  the 2007 Notes offering.

19       48.    Defendant Scotia Capital (USA) Inc. ("Scotia") is a wholly owned subsidiary of

20  Scotia Capital Inc., which offers multi-product solutions to clients' financial needs in the United

21  States. Additionally, it offers mergers and acquisitions advisory, private placement, negotiation

22  assistance, due diligence, and restructuring services and provides research, equity sales and

23  trading. Scotia was an underwriter of the 2007 Notes offering.

24       49.    Defendant Sovereign Securities Corporation, LLC ("Sovereign") is a security

25  brokerage firm. The firm underwrites municipal debt focusing on short-term instruments such as

26  tax bond, and tax and revenue anticipatory notes. Additionally, Sovereign advises, structures,

27  underwrites, and services the needs of issuers of taxable and tax exempted debt. Sovereign is

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

1   headquartered in Philadelphia, Pennsylvania and operates as a subsidiary of Santander Holdings

2   USA, Inc.  Sovereign was an underwriter of the 2007 Notes offering.

3       50.    Defendant Utendahl Capital Partners, L.P. ("Utendahl") is a boutique investment

4   bank.  Utendahl's products and services include underwriting and trading of fixed-income, equity

5   and convertible securities, general corporate finance, structured finance, mergers and acquisitions

6   and asset management.  Utendahl was acquired by Williams Capital on or about January 10, 2010.

7   Utendahl was an underwriter of the 2007 Notes offering.

8       51.    Defendant Daiwa Securities SMBC Europe Limited ("Daiwa") is an investment

9   banking firm that provides equity, fixed income, investment banking, derivatives, and strategic

10   advisory services.  The firm also underwrites and manages new issues, and carries out trading and

11   sales of secondary securities.  Daiwa Securities SMBC Europe Limited changed its name to Daiwa

12   Capital Markets Europe Limited in January 2010.  Daiwa was an underwriter of the 2007 and

13   2008 Notes offerings.

14       52.    Defendant BNP Paribas S.A. ("BNP") is a France-based bank group with

15   operations throughout the world.  BNP was an underwriter of the 2008 Notes offering.

16       53.    Defendant Fortis Securities LLC ("Fortis") is an integrated financial services

17   provider engaged in providing business support services.  Fortis was an underwriter of the 2008

18   Notes offering.

19       54.    Defendant ING Financial Markets LLC ("ING") offers investment banking and

20   corporate financial services.  ING is based in New York, New York and operates as a subsidiary

21   of ING Groep NV.  ING was an underwriter of the 2008 Notes offering.

22       55.    Defendant M.R. Beal & Company ("MR Beal") is a full-service investment

23   banking firm, which includes public finance, corporate debt and equity, fixed-income sales and

24   trading, and financial advisory services.  MR Beal was an underwriter of the 2008 Notes offering.

25       56.    Defendant SG Americas Securities, LLC ("SG Americas") provides investment

26   banking services.  It focuses on capital markets, securities, underwriting, mergers and acquisitions,

27   derivatives, and trading services, SG Americas is based in New York, New York and operates as a

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

- 11 -
COMPLAINT

1  subsidiary of Societé Generale Group.  SG Americas was an underwriter of the 2008 Notes

2  offering.

3      57.     Defendant Commerzbank Corporates & Markets ("C&M") is an integrated

4  corporate and investment bank, providing corporate and institutional clients with a commercial

5  and investment banking products.  C&M is globally active, and has offices in Frankfurt, London,

6  New York, Honk Kong and Singapore.  C&M was an underwriter of the 2008 Notes offering.

7      58.     Defendant Natixis Bleichroeder Inc. ("Natixis") provides securities brokerage,

8  equity trading, and research services to individuals, corporations, and institutional investors.

9  Natixis offers corporate finance services, including mergers and acquisitions, divestitures, and

10  investment advice.  Natixis is headquartered in New York, New York.  Natixis was an underwriter

11  of the 2008 Notes offering.

12      59.     The defendants referenced in ¶¶38-58 above are referred to herein as the

13  "Underwriter Defendants."

14      60.     The Underwriter Defendants are liable for the false and misleading statements in

15  the Shelf Registration Statement and documents incorporated by reference therein (*i.e.*, the 2007

16  and 2008 Offering Materials).  In connection with the 2007 and 2008 Notes offerings, the

17  Underwriter Defendants reviewed and disseminated the 2007 and 2008 Offering Materials,

18  including the pricing supplements to the relevant base prospectuses that amended or updated the

19  original Shelf Registration Statement to which they were traceable.  The Underwriter Defendants

20  solicited sales of the 2007 and 2008 Notes and were paid fees in connection therewith.  The

21  Underwriter Defendants had a duty to discover and compel disclosure of material facts about the

22  2007 and 2008 Notes offerings, as well as to ensure that statements in the 2007 and 2008 Offering

23  Materials were truthful and complete.  Had the Underwriter Defendants conducted a reasonable

24  investigation at the time of the 2007 and 2008 Notes offering, the true, but undisclosed, facts

25  would have been readily apparent to them.  The Underwriter Defendants' failure to conduct

26  adequate due diligence was a substantial factor leading to the harm complained of herein.

27      61.     State Fund asserts two distinct sets of claims against Defendants: negligence-based

28  claims and claims which sound in fraud.  State Fund alleges that the Officer Defendants, as

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 12 -
COMPLAINT

1  defined herein, knowingly participated in a fraudulent scheme to defraud investors such as State

2  Fund.  State Fund alleges that the Director Defendants and the Underwriter Defendants, as defined

3  herein, participated in the dissemination of fraudulent statements without awareness of the actual

4  fraud.

5  **BACKGROUND**

6       62.      Lehman was an integrated financial services institution that provided commercial

7  and investment banking services, commercial loans to corporate entities, and acted as an

8  underwriter in the sale of corporate securities.  Lehman is not a named defendant in this lawsuit

9  due to its filing, on September 15, 2008, for bankruptcy protection under Chapter 11 of the

10 Bankruptcy Code.  Similarly, LBI is not a named defendant in this lawsuit due to its forced

11 dissolution on September 19, 2008.  LBI was wholly owned by Lehman and was Lehman's

12 primary broker-dealer subsidiary.

13      63.      Beginning in 1994, Defendant Fuld, as CEO of Lehman, was determined to

14 diversify the firm away from being a second-tier bond-trading shop and turn it into a full service

15 investment bank.  Fuld, known as "The Gorilla" of Wall Street given his relentless style, steered

16 the Company into the budding mortgage-backed securities market and eventually deep into risky

17 subprime and Alt-A mortgages.

18      64.      The decision initially paid off and Lehman soon became one of the dominant

19 players in the real estate market, being engaged in all aspects of the mortgage market from

20 originating the mortgages to securitization of the loans.  Through its subsidiaries, Aurora and

21 BNC, Lehman was one of the ten largest mortgage lenders in the U.S.  These subsidiaries in turn

22 sold nearly all of their loans to Lehman, making Lehman one of the largest issuers of mortgage-

23 backed securities.  From 2004 to 2007, Lehman securitized $480 billion in mortgages, with Aurora

24 originating one third of the securitized loans and BNC originating another 20% of them.

25      65.      Lehman's real estate activities and in particular the fees generated from the sale of

26 its mortgage-backed securities helped the Company report record earnings in 2004, 2005, 2006,

27 and 2007.  Sales in its capital markets business segment, which included its mortgage origination

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 13 -

COMPLAINT

and securitization activities, increased 56% from 2004 to 2006, a faster growth rate than in Lehman's two other business segments.

66.     Nonetheless, in order to continue fueling the unprecedented growth, Lehman began employing high-risk, deceptive lending practices in originating subprime and Alt-A loans at least as early as 2004 and continuing through 2007.  These high-risk loans were then bundled together into mortgage-backed securities and either sold to investors or held by Lehman if it was unable to sell them on.

67.     In addition, due to an SEC change which relaxed the rule limiting the amount of leverage that Lehman and other investments banks were allowed to use, Lehman substantially increased its use of leverage to fund its real estate investment activities beginning in 2004.  The increase in leverage aggravated Lehman's risk exposure making it more vulnerable to deteriorations in the real estate market.

68.     Partly as a result of Lehman's mortgage-related risks and increasing exposure to risky subprime and Alt-A mortgages and its dramatic increase in its reliance on leverage, Lehman collapsed into bankruptcy in September 2008.  Statements made by Defendants from at least 2004 through mid-September 2008, including statements made in the offering documents prepared, reviewed and/or disseminated by Defendants, failed to adequately disclose the Company's mortgage-related activities and exposures, and the risks associated with these activities and exposures.

**Mortgage Origination Business**

69.     Lehman's public statements, including those contained in the 2007 and 2008 Offering Materials and other SEC filings, were false and misleading as to Lehman's mortgage origination business in that the statements failed to disclose that Lehman had employed high-risk lending practices in originating subprime and Alt-A loans and the true risks associated with its aggressive mortgage practices.

70.     In order to fuel its securitization pipeline, the Officer Defendants caused Lehman to provide a great deal of assistance to aggressive mortgage lending companies.  Lehman would provide the mortgage companies with assistance in going public.  Lehman would further provide

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 14 -
COMPLAINT

1 | these companies with warehouse lines of credit in order for the companies to be able to originate

2 | loans to home buyers.  Lehman would then buy the loans originated with its lines of credits from

3 | the mortgage companies and bundle them into securities to resell to investors.  Many of these

4 | loans were issued by questionable lenders, such as First Alliance - a mortgage lender that

5 | collapsed in 2000 due to its deceptive mortgage practices.[2]  Nonetheless, Lehman continued to do

6 | business with these lenders in order to meet the demand for its securitizations.

7 |     71.    Later, as the market for mortgage-backed securities continued to grow, the Officer

8 | Defendants caused Lehman to purchase interests in mortgage lending companies in order to meet

9 | its ever increasing demand for real estate loans.  In 2003 and 2004, with the housing boom

10 | underway, Lehman acquired five mortgage lenders, including Alt-A lender Aurora and subprime

11 | lender BNC.

12 |     72.    In many instances, the borrowers or brokers inflated the income reported on stated-

13 | income loans or "liar loans."  The brokers and mortgage bankers had every incentive to make the

14 | loans, as they were paid generously whether the loan later went into default or not.  Many of the

15 | borrowers accepted risky loans with no money down and loans with low "teaser" interest rates,

16 | knowing that they would be unable to make the payments once the interest rates reset.

17 | Nonetheless, the borrowers were told they would easily be able to refinance or sell the property at

18 | the time of the reset as real estate prices were continuing to rise.

19 |     73.    As a result, the Alt-A market grew substantially from $190 billion in 2004 to $400

20 | billion in 2006.  The Officer Defendants were fully aware of the risk practices being employed by

21 | Aurora but permitted them to continue in order to continue obtaining loans for the Company's

22 | lucrative securitization transactions.  An article in The Globe and Mail dated December 22, 2008,

23 | entitled "Lehman's Rise and Fall," provided in pertinent part:

24 |         Mark Golan was getting frustrated as he met with a group of auditors from
Lehman Brothers.

25

26 |         It was spring, 2006, and Mr. Golan was a manager at Colorado-based
Aurora Loan Service LLC, which specialized in "Alt A" loans, considered a step

27 |     [2] In a California class-action case, a jury reached a verdict in June 2003, finding Lehman

28 | partially responsible for First Alliance's conduct and ordering the Company to pay $5 million in
damages.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 15 -

above subprime lending.  Aurora had become one of the largest players in that market, originating $25-billion worth of loans in 2006.  It was also the biggest supplier of loans to Lehman for securitization.

Lehman had acquired a stake in Aurora in 1998 and had taken control in 2003.  *By mid-2006, some people inside Lehman were becoming worried about Aurora's lending practices.*  The mortgage industry was facing scrutiny about billions of dollars worth of Alt-A mortgages, also known as "liar loans"-because they were given to people with little or no documentation.  In some cases, borrowers demonstrated nothing more than "pride of ownership" to get a mortgage.

*That spring, according to court filings, a group of internal Lehman auditors analyzed some Aurora loans and discovered that up to half contained material misrepresentations.  But the mortgage market was growing too fast and Lehman's appetite for loans was insatiable.  Mr. Golan stormed out of the meeting, allegedly yelling at the lead auditor; "Your people find too much fraud."*

74.     By mid-2005, mortgage defaults and delinquencies in the subprime category began to grow.  Beginning in at least 2006 (the same time that the Shelf Registration Statement was being prepared), cracks were apparent in the mortgage market.  Lehman's own traders saw signs of trouble in the housing market and in late 2006 even began to bet against the price of home loans.  Nonetheless, Aurora continued its risky lending practices and continued making Alt-A loans, although at a somewhat lower level, throughout 2007.  It was not until January 2008 that Lehman suspended its wholesale and correspondent lending activities at Aurora.

**Mortgage Securitization Business**

75.     The Officer Defendants concealed that Lehman had failed to engage in proper due diligence in securitizing high-risk loans.  The Defendants further caused Lehman to fail to properly value its mortgage-related assets.

76.     The high demand for and the lucrative fees generated by Lehman's mortgage securitization practice fueled its high-risk mortgage origination activities as Lehman needed more and more loans in order to continue putting together mortgage-backed securities at increasing rates.  Similar to the compensation system in place in Lehman's mortgage origination practice, the compensation in its mortgage securitization practice was paid based on how many mortgage-backed securities were put out every year, thus providing incentives to not engage in proper due diligence in assessing the quality of the loans underlying the securitized transactions.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 16 -

COMPLAINT

77.     In connection with some of its securitization transactions, Lehman would often hold onto certain of the lower-rated/higher-risk tranches of its mortgage-backed securitization transactions if it was unable to sell the higher risk slices to other investors or if it wanted to add to its own investment returns.

78.     Beginning in late 2006, as default rates on subprime loans spiked, the securitization market began to dry up. By August 2007, investors' appetite for these securities had diminished significantly. As a result, Lehman began to accumulate additional large amounts of Alt-A mortgages and mortgage-backed assets. However, Lehman failed to properly write down those assets as their value declined. Indeed, Lehman's failure to properly write down its Alt-A and mortgage-related exposure is illustrated by the much larger write-downs recorded by its peers in the same time period with regard to similar assets.

79.     For example, in the third quarter of 2007, Merrill Lynch recorded a $7.9 billion write-down against $28.8 billion of certain mortgage-related securities, while UBS wrote down roughly $3.7 billion of its $19 billion in mortgage-backed securities. In comparison, Lehman took a net write-down of $700 million in the same quarter against its $88 billion in mortgage-related holdings.

80.     In the fourth quarter of 2007, Citigroup wrote down $17.4 billion against $44.4 billion in subprime-related assets and Merrill Lynch wrote down $11.5 billion against $28.9 billion in such assets. In the same quarter, Lehman took a total net write-down of only $1.5 billion on its mortgage- and asset-backed holdings of over $70 billion. Thus, while Citigroup's and Merrill Lynch's write-downs equaled 39% and 40% of their respective subprime assets, Lehman wrote down only 2% of its subprime assets.

81.     Finally, on September 10, 2008, Lehman pre-announced a staggering $7 billion gross write-down of its mortgage-related holdings for the third quarter of 2008, stating: "The majority of our write-downs were in Alt-A driven by an increase in Alt-A delinquencies and loss expectations which were specific to Alt-A prices. . . ."

82.     The failure to timely write down the impaired Alt-A assets was due in part to improper shifts in large amounts of Lehman's mortgage assets into the Level 3 accounting

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 17 -
COMPLAINT

category in order to avoid writing them down, which overstated the value of Lehman's Alt-A assets and inflated certain real estate and mortgage holdings far above what many were sold for shortly thereafter.

83.     Level 2 assets are valued using, inter alia, objective market data such as the market prices of mortgage-related assets as reflected in the ABX and CMBX indices.  In contrast, Level 3 assets are valued at management's discretion using internal models instead of objective market data.  By improperly categorizing assets as Level 3 and by using inappropriate models to inflate the reported values of those assets, Lehman reported inflated values for billions of dollars in assets.

84.     During 2007, the ABX index declined significantly, as did the CMBX.  As a result, Level 2 assets that had to be valued in relation to market prices should have been marked down accordingly.  Instead of doing so, however, Lehman improperly recategorized large swaths of assets as Level 3 and maintained their inflated valuations using models instead of market prices.  Indeed, the percentage of mortgage- and asset-backed securities Lehman categorized as Level 3 increased from $20.8 billion (12.5%) in the second quarter of 2007 to $37.9 billion (28%) a year later.  This shift allowed Lehman to avoid huge write-downs that would otherwise have been required due to the decline in market prices for mortgage-related assets.

**Commercial and Other Real Estate Holdings**

85.     In addition to Lehman's lending and securitization activities, Lehman also held investments in commercial and other types of real estate-related assets.  As the real estate market declined, Lehman further suffered substantial losses in its commercial real estate portfolio.  Lehman was required to "mark to market" its commercial real estate holdings, meaning to value the assets at the level at which they could be sold right away.  Nonetheless, Lehman failed to aggressively mark down the value despite the substantial decline in Lehman's portfolio, causing Lehman's portfolio to be vastly overstated.

86.     In late August/early September 2008, Lehman sought to extricate itself from its toxic commercial real estate by selling it to an outside investor.  Lehman approached Barclays, Bank of America, Goldman Sachs and Credit Suisse to consider purchasing the Company's

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 18 -
COMPLAINT

1   commercial real estate portfolio.  Upon review of Lehman's internal documents, executives at

2   several of the companies were able to quickly surmise that the portfolio was substantially

3   overvalued.  As a result, Lehman remained unable to find a buyer for its troubled portfolio.

4          87.    On October 6, 2008, *The Wall Street Journal* reported on the results of negotiations

5   concerning the sale of Lehman and/or some of its assets.  According to Lehman documents

6   reviewed in connection with the article by *The Wall Street Journal*, Lehman reported the value of

7   its commercial real estate holdings to be $32.6 billion at the time.  According to several Wall

8   Street executives who reviewed Lehman's documents and analyzed the valuations, they believed

9   the portfolio to be overstated by as much as 35%.  Lehman further reported the value of certain

10  European real estate loans at nearly $0.98 on the dollar, but valued substantially similar U.S.

11  assets at only $0.56 on the dollar.  While the European real estate market had been slightly better

12  than the U.S. market, it had also suffered substantial declines.  As a result of these and other

13  inflated valuations, no suitors for Lehman or its assets were found.  Further, neither the U.S.

14  Federal Reserve nor the Treasury would agree to bail Lehman out in part due to similar over-

15  valuations.

16         88.    One example of the type of risky real estate deals that Lehman was involved in was

17  bridge equity financing.  Bridge equity financing involves equity or short-term debt financing

18  raised within 6 to 18 months of an anticipated deal.  It is temporary financing, as it is meant to

19  "bridge" a company to the next round of financing.  Typically bridge financing deals have been

20  used by companies just prior to going public or just prior to completing a private placement

21  transaction.

22         89.    While Lehman had been engaged in bridge equity transactions since the mid-90s,

23  Lehman's use of these types of deals increased substantially beginning in 2003.  Lehman engaged

24  in bridge equity financing transactions in the real estate context by allowing real estate developers

25  to purchase commercial real estate property with financing from Lehman's bridge equity

26  transactions.  The fees associated with these types of deals were lucrative as they were twice the

27  amount of the fees earned by a loan securitization transaction, and bridge equity deals soon

28  became a signature product for the Company.  Nonetheless, while these deals did provide Lehman

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

1    with a good return, they also provided Lehman with increased risks and exposure to the

2    commercial real estate market.

3    **Leverage Exposure**

4        90.    Lehman further took on additional unnecessary risks by significantly increasing its

5    leverage exposure. Leverage is the total ratio of assets to shareholder value. It involves using

6    borrowed funds or debt to increase returns to equity. The Company leveraged its net assets by

7    borrowing money using its assets as collateral and then using the proceeds to pursue its high-risk

8    real estate investments. While the use of leverage greatly increases a company's potential gain

9    from an investment, it also greatly increases a company's potential loss as the company is exposed

10   to loss on its new investments in addition to loss associated with its original assets. Moreover, the

11   use of off-balance-sheet vehicles to create leverage may conceal from investors the full extent of a

12   company's risk exposure.

13       91.    In 2004, the SEC relaxed a rule limiting the amount of leverage that Lehman and

14   other investments banks were allowed to use. Previously, longstanding SEC rules required banks

15   to limit their debt-to-net capital ratio to 15-to-l, meaning that for every $15 of debt, the banks were

16   required to have $1 of equity. Nonetheless, in 2004, the SEC relaxed the minimum capital

17   requirement for investment banks that voluntarily participated in a program in exchange for the

18   participating banks agreeing to additional SEC oversight of their broker-dealer and holding

19   company operations. Lehman and the other large investment banks voluntarily agreed to the

20   program.

21       92.    As a result, Lehman's use of leverage greatly increased. Between 2004 and 2007,

22   Lehman's balance sheet increased by almost $300 billion through the purchase of securities often

23   backed by residential and commercial real estate loans. During the same time frame, the firm only

24   added $6 billion in equity. The increased use of leverage added to Lehman's achieving four years

25   of record-breaking financial results.

26       93.    Nonetheless, Lehman's use of leverage made it vulnerable to declines in the value

27   of its assets. As the real estate market imploded, Lehman's leverage began to consume a

28   substantial amount of its capital.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 20 -

COMPLAINT

94.     Moreover, Lehman's leverage risk was exacerbated by its use of short-term debt financing.  While short-term debt is cheaper than long-term debt and thus provides a company with greater profit potential, strong reliance on short-term debt creates additional risks as the short-term debt needs to be constantly refinanced, including the risk of a bank run when a financial institution is rumored to be insolvent.

95.     More than 50% of Lehman's assets were financed by short-term borrowings.  Given a large amount of Lehman's assets were tied up in illiquid mortgage-related securities due to the subprime mortgage crisis, Lehman was unable to sell its assets except at a substantial loss.  This caused pressure on Lehman as the credit markets tightened up and the Company began having trouble rolling over its short-term debt.

96.     In early September 2008, as rumors persisted about Lehman's solvency, many of the firm's hedge fund clients began to pull large amounts of money out of the Company at a rapidly increasing pace.  In addition, on September 11, 2008, J.P. Morgan Chase & Co.  ("J.P. Morgan"), who acted as the financial middleman between Lehman and many of its clients, demanded Lehman provide J.P. Morgan with $5 billion in additional collateral to cover lending positions that J.P. Morgan's clients had with Lehman.  Due to its inability to obtain new financing, the Company was so weakened by the cash outflows that it filed for bankruptcy four days later, unable to cover many of its outstanding collateral positions.

## LEHMAN'S FALSE AND MISLEADING PUBLIC FILINGS

97.     Lehman's public filings, including its quarterly and annual financial statements for fiscal years 2004 through 2007, were false and misleading because they, inter alia, (1) failed to disclose Lehman's Repo 105 transactions (described below); (2) failed to disclose known trends and uncertainties; (3) failed to disclose Lehman's risk concentrations; (4) misrepresented Lehman's risk management practices, and (5) contained untrue statements regarding Lehman's liquidity risk and risk of bankruptcy.  Thus, Lehman's financial statements during this time period were not a fair presentation of the Company's results and were presented in violation of GAAP and SEC rules.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

98.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need lot include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.01(a).

99.     A fundamental precept of GAAP is that impairment of securities which is deemed to be other than temporary should be recorded as a charge against earnings.  Lehman failed to properly account for Lehman's impaired investments in violation of GAAP.

**(1)     Lehman Failed to Disclose Its Improper and Misleading Repo 105 Transactions**

100.    Defendants failed to disclose that Lehman's 2001-2008 financial results were falsified, materially misleading, and not presented in accordance with GAAP due to Lehman's use of an accounting maneuver it called Repo 105.

101.    A repurchase or "repo" transaction is a transaction in which a borrower temporarily gives a financial security to a lender as collateral in order to obtain a cash loan, but "repurchases" the security at the end of the redemption period to pay off the loan.  In a typical banking industry repurchase transaction, a bank seeking to meet short-term cash needs borrows money from a large counterparty on a short-term basis, typically at a fixed interest rate.  In order to effect the repurchase loan, the bank must deliver or provide agreed-upon collateral in the form of a high grade security, such as a treasury bond, and concurrently agrees to repurchase the same security back from the lender at a fixed price by some agreed-upon later date.  Because such a transaction is, in substance, a secured loan, accounting rules require that this transaction be accounted for as a collateralized borrowing: the bank records debt on its balance sheet for the loan, the securities used to collateralize the loan remain on the bank's balance sheet, and the incoming loan proceeds are accounted for as "Cash provided by financing activities" on the company's Statement of Cash Flows.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

- 22 -

COMPLAINT

102.    Lehman began using Repo 105 transactions in 2001.  Lehman did not disclose its accounting treatment or use of Repo 105 transactions, either by name or characterization, in its SEC filings.  Moreover, Lehman affirmatively represented that it treated its repo transactions as financing transactions – that is, not as sales – for purposes of financial reporting.  Further, the net leverage ratio Lehman reported was misleading because Lehman did not disclose how it achieved this result.  Lehman's MD&A statements about its liquidity and liabilities (i.e., obligation to repurchase the securities) were also deficient and misleading; in contrast to a borrowing under an ordinary repurchase agreement, the amount borrowed under a Repo 105 was not reflected in Lehman's MD&A statements.

103.    According to the Bankruptcy Examiner's 2,200 page report on Lehman, an April 2008 email asking about REPO 105 generated a response by Bart McDade, the firm's then-head of equities and subsequently its chief operating officer:  "'I am very aware ... it is another drug we r [sic] on.'"

104.    Lehman's trick was to use a clause in the accounting rules to classify the deal as a sale, even though it was still obliged to repurchase the assets at a later date.  That meant the assets disappeared from the balance sheet, and it could use the cash it received to temporarily pay down other liabilities.

105.    Emails cited by the Examiner's report describe the transactions as "'window-dressing'" and an "'accounting gimmick,'" and state, "'We have a desperate situation and I need another 2 billion from you [for first quarter 2008] either through Repo 105 or outright sales.  Cost is irrelevant, we need to do it.'"

(a)    **Lehman's Use of Repo 105 Transactions Was Material**

106.    Lehman's Repo 105 transactions represented billions of dollars of quarter-end manipulations.  According to the Examiner's report, from 2001, when Lehman first began using Repo 105 transactions, until early-to-mid 2007, Lehman engaged in a relatively consistent volume of Repo 105 transactions, including at quarter-end, generally within a range of between $20 and $25 billion.  In Q3 2007, Lehman's Repo 105 transactions totaled $29.054 billion.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 23 -

COMPLAINT

107.    By classifying certain repo borrowings as "sales," Lehman also artificially inflated certain risk-based capital ratios, including its "Tier one leverage" ratio.  Because banks are expected to maintain capital ratios at certain levels in order to be considered adequately capitalized, these ratios are closely followed by investors, security analysts and rating agencies.

108.    Without further disclosure of Lehman's contrived accounting for repos and its impact on reported risk-based capital ratios, investors and analysts had no way of knowing Lehman's Tier one leverage ratio was misleading.

109.    Accounting rules, including Statement of Financial Accounting Standards No. 140 ("SFAS 140") and related literature require that a transaction be accounted for in accordance with its economic substance, rather than its mere form.  This accounting guideline applies to all transactions, including Lehman's repurchase transactions, and is reflected broadly in GAAP.  For example, FASB Statements of Financial Accounting Concepts No. 2, Qualitative Characteristics of Accounting Information, ¶160, states:

> The quality of reliability and, in particular, *representational faithfulness leaves no room for accounting representations that subordinate substance to form.*

110.    Accordingly, accounting for a transaction or event should generally be faithful to its economic reality.  The substance is the economic reality of the facts and circumstances stipulated in the arrangement.  While substance and form may be the same, they sometimes differ.  To evaluate the substance of a transaction, it is necessary to consider all the information reflective of the economic reality of the situation rather than to focus on the form in an isolated document.  The following authoritative auditing literature further emphasizes the underlying importance of ensuring that the accounting treatment reflects the substance of the transaction:

> [T]he auditor should be aware that the substance of a particular transaction could be significantly different from its form and that *financial statements should recognize the substance of particular transactions rather than merely their legal form.*

AU §334.02.

> Generally accepted accounting principles recognize the importance of reporting transactions and events in accordance with their substance.  The auditor should

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

consider whether the substance of transactions or events differs materially from their form.

AU §411.06.

111.    Lehman knew that the economic substance and intent of its Repo 105 transactions was that they were, in fact, borrowings, not the selling of trading securities.

**(b)      Lehman Violated GAAP and SEC Rules by Not Disclosing Its Practices with Respect to Repo Sales Transactions in Its Form 10-Ks and 10-Qs**

112.    Lehman was required, but failed, to disclose any information regarding its accounting policies for repo sales transactions, and the transactions' impact on the Company's publicly-reported financial statements and metrics in 2001-2008.  GAAP establishes how particular types of account balances, activity and events are to be disclosed within a company's financial statements.  Similarly, SEC rules establish incremental disclosure requirements in both Lehman's financial statement footnotes and the MD&A sections of its Form 10-K and 10-Q SEC filings.  Such required disclosures are essential to investors', analysts' and rating agencies' understanding of a public company's financial statement, and are considered an integral part of the financial statements and SEC filing.  The SEC Staff has generally observed that an issuer's MD&A should provide an explanation of the company's financial statements "through the eyes of management."  *See Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, SEC Release FR No. 72, §B (Dec. 29, 2003).  GAAP further requires that accounting policy disclosures in the footnotes to the financial statements must contain disclosures for accounting principles that materially affect the determination of cash flows.  See Accounting Principles Board Opinion No. 22, *Disclosure of Accounting Polices*, ¶12, and FASB Statements of Financial Accounting Concepts Nos. 1 and 2.  As alleged above, Lehman's accounting principles regarding repo sales contracts clearly impacted the presentation of Lehman's cash flows in a material way and, accordingly, should have been disclosed.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 25 -

COMPLAINT

113.     There can be no dispute that Lehman did not disclose any information regarding its accounting for repo transactions as sales rather than borrowings in any of its 2001-2008 Form 10-K or 10-Q SEC filings.  The Bankruptcy Examiner noted in footnote 3497:

> The Examiner has investigated Lehman's use of Repo 105 transactions and has concluded that the balance sheet manipulation was intentional, for deceptive appearances, had material impact on Lehman's net leverage ratio, and, because Lehman did not disclose the accounting treatment of these transactions, rendered Lehman's Forms 10-K and 10-Q (financial statements and MD&A) deceptive and misleading.

114.     Due to these accounting improprieties, Lehman's financial results and statements for FY 2001 through FY 2008 violated GAAP, including the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, % ¶ 10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

1   information about the past to help in assessing the prospects of an enterprise.  Thus, although

2   investment and credit decisions reflect investors' expectations about future enterprise performance,

3   those expectations are commonly based at least partly on evaluations of past enterprise

4   performance (FASB Statement of Concepts No. 1, ¶42);

5          (f)     The principle that financial reporting should be reliable in that it represents

6   what it purports to represent was violated.  That information should be reliable as well as relevant

7   is a notion that is central to accounting (FASB Statement of Concepts No.  2, ¶¶58-59);

8          (g)     The principle of completeness, which means that nothing is left out of the

9   information that may be necessary to insure that it validly represents underlying events and

10  conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

11         (h)     The principle that conservatism be used as a prudent reaction to uncertainty

12  to try to ensure that uncertainties and risks inherent in business situations are adequately

13  considered was violated.  The best way to avoid injury to investors is to try to ensure that what is

14  reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

15         115.    Further, the undisclosed adverse information is the type of information which,

16  because of SEC regulations, regulations of the national stock exchanges and customary business

17  practice, is expected by investors and securities analysts to be disclosed and is known by corporate

18  officials and their legal and financial advisors to be the type of information which is expected to

19  be and must be disclosed.

20  **(2)     Lehman's 10-Ks Contained Misrepresentations And Omissions Related To Known**

21          **Trends And Uncertainties, Risk Concentrations, Risk Management and Liquidity.**

22         116.    Lehman's FY 2005 Form 10-K, filed on February 13, 2006 and expressly

23  incorporated into the 2007 Offering Materials, provided in the Management Discussion and

24  Analysis ("MD&A") section as follows:

25  Capital Markets

26                                  * * *

27         Net revenues totaled $9.8 billion, $7.7 billion and $6.0 billion in 2005,
    2004 and 2003, respectively.  Capital Markets net revenues in 2005 represent the
28  seventh consecutive year of record performance in Fixed Income and the second

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

- 27 -

COMPLAINT

highest revenue level in Equities. Fixed Income revenues rose 28% in 2005 compared with 2004 on improved client-flow activities, an increased contribution from the non-US regions and record revenues across a number of products. . . . Fixed Income revenues improved in 2004 compared with 2003 as a favorable interest rate environment helped drive strength in mortgage originations and securitizations as well as interest rate products and the declining dollar drove higher foreign exchange activity. . . .

Fixed Income net revenues were a record $7.3 billion in 2005, increasing 28% compared with 2004 driven by double digit revenue increases from each geographic region and record revenues across a number of businesses including commercial mortgage and real estate, residential mortgage origination and securitization, and interest rate products. Revenues from our commercial mortgage and real estate businesses increased substantially in 2005 reaching record levels, as the strong demand for commercial real estate properties, the recovery in certain property markets and relatively low interest rates drove asset sales and robust levels of securitizations. ***Revenues from our residential mortgage origination and securitization businesses increased in 2005 from the robust levels in 2004, reflecting record volumes and the continued benefits associated with the vertical integration of our mortgage origination platforms.*** We originated approximately $85 billion and $65 billion of residential mortgage loans in 2005 and 2004, respectively. We securitized approximately $133 billion and $101 billion of residential mortgage loans in 2005 and 2004, respectively, including both originated loans and those we acquired in the secondary market. While the performance in our mortgage businesses reached record levels, these businesses were affected by somewhat lower levels of mortgage origination volumes and revenues in the U.S. in the latter half of 2005, partly offset by stronger volumes and revenues outside the U.S. We originated approximately $27 billion and $13 billion of commercial mortgage loans in 2005 and 2004, respectively, the majority of which has been sold through securitization or syndication activities during both 2005 and 2004. Interest rate product revenues increased in 2005 on higher activity levels, as clients repositioned portfolios in light of rising global interest rates and a flattening U.S. yield curve. Credit product revenues also increased in 2005 as compared to 2004 driven by strength in both high yield and high grade credit products. Fixed Income net revenues increased 31% in 2004 compared with 2003, reflecting generally favorable market conditions. The mortgage securitization business was notably strong, with revenues in mortgage products benefiting from the low rate environment as well as the continued vertical integration of our mortgage origination platforms.

* * *

***Mortgages, mortgage-backed and real estate inventory positions.*** Mortgages and mortgage-backed positions include mortgage loans (both residential and commercial), non-agency mortgage-backed securities and real estate investments. We are a market leader in mortgage-backed securities trading. We originate residential and commercial mortgage loans as part of our mortgage trading and securitization activities. We originated approximately $85 billion and $65 billion of residential mortgage loans in 2005 and 2004, respectively. We securitized approximately $133 billion and $101 billion of residential mortgage loans in 2005 and 2004, respectively, including both originated loans and those we acquired in the secondary market. In addition, we originated approximately $27 billion and $13 billion of commercial mortgage loans in 2005 and 2004, respectively, the majority of which has been sold through securitization or syndicate activities during both 2005 and 2004. See Note 3 to the Consolidated Financial Statements for additional information about our securitization activities.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

We record mortgage loans at fair value, with related mark-to-market gains and losses recognized in Principal transactions in the Consolidated Statement of Income.

Management estimates are generally not required in determining the fair value of residential mortgage loans because these positions are securitized frequently. Certain commercial mortgage loans and investments, due to their less liquid nature, may require management estimates in determining fair value. Fair value for these positions is generally based on analyses of both cash flow projections and underlying property values. We use independent appraisals to support our assessment of the property in determining fair value for these positions. Fair value for approximately $3.6 billion and $3.8 billion at November 30, 2005 and 2004, respectively, of our total mortgage loan inventory is determined using the above valuation methodologies, which may involve the use of significant estimates. Because a portion of these assets have been financed on a non-recourse basis, our net investment position is limited to $3.5 billion and $2.9 billion at November 30, 2005 and 2004, respectively.

We invest in real estate through direct investments in equity and debt. We record real estate held for sale at the lower of cost or fair value. The assessment of fair value generally requires the use of management estimates and generally is based on property appraisals provided by third parties arid also incorporates an analysis of the related property cash flow projections. We had- real estate investments of approximately $7.9 billion and $10.7 billion at November 30, 2005 and 2004, respectively. Because significant portions of these assets have been financed on a non-recourse basis, our net investment position was limited to $4.8 billion and $4.1 billion at November 30, 2005 and 2004, respectively.

117.   The FY 2005 Form 10-K further provided in the MD&A section as follows concerning Lehman's liquidity and risk management practices:

Liquidity, Funding and Capital Resources

Management's Finance Committee is responsible for developing, implementing and enforcing our liquidity, funding and capital policies. These policies include recommendations for capital and balance sheet size as well as the allocation of capital and balance sheet to the business units. Management's Finance Committee oversees compliance with policies and limits with the goal of ensuring we are not exposed to undue liquidity, funding or capital risk.

Liquidity Risk Management

We view liquidity and liquidity management as critically important to the Company. Our liquidity strategy seeks to ensure that we maintain sufficient liquidity to meet all of our funding obligations in all market environments. Our liquidity strategy is centered on five principles:

- We maintain a liquidity pool available to Holdings that is of sufficient size to cover expected cash outflows over the next twelve months in a stressed liquidity environment.

- We rely on secured funding only to the extent that we believe it would be available in all market environments.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

- 29 -

COMPLAINT

- We aim to diversify our funding sources to minimize reliance on any given providers.

- Liquidity is assessed at the entity level.  For example, because our legal entity structure can constrain liquidity available to Holdings, our liquidity pool excludes liquidity that is restricted from availability to Holdings.

- We maintain a comprehensive Funding Action Plan that represents a detailed action plan to manage a stress liquidity event, including a communication plan for regulators, creditors, investors and clients.

* * *

Risk Management

As a leading global investment bank, risk is an inherent part of our business.  Global markets, by their nature, are prone to uncertainty and subject participants to a variety of risks.  The principal risks we face are credit, market, liquidity, legal, reputation and operational risks.  Risk management is considered to be of paramount importance in our day-to-day operations.  Consequently, we devote significant resources (including investments in employees and technology) to the measurement, analysis and management of risk.

While risk cannot be eliminated it can be mitigated to the greatest extent possible through a strong internal control environment.  Essential in our approach to risk management is a strong internal control environment with multiple overlapping and reinforcing elements.  We have developed policies and procedures to identify, measure, and monitor the risks, involved in our global trading, brokerage and investment banking activities.  Our approach applies analytical rigor overlaid with sound practical judgment working proactively with the business areas before transactions occur to ensure appropriate risk mitigants are in place.

We also seek to reduce risk through the diversification of our businesses, counterparties and activities in geographic regions.  We accomplish this objective by allocating the usage of capital to each of our businesses, establishing trading limits and setting credit limits for individual counterparties.  Our focus is balancing risk versus return.  We seek to achieve adequate returns from each of our businesses commensurate with the risks they assume.  Nonetheless, the effectiveness of our approach to managing risks can never be completely assured.  For example, unexpected large or rapid movements or disruptions in one or more markets or other unforeseen developments could have an adverse effect on our results of operations and financial condition.  The consequences of these developments can include losses due to adverse changes in inventory values, decreases in the liquidity of trading positions, increases in our credit exposure to clients and counterparties and increases in general systemic risk.

Our overall risk limits and risk management policies are established by the Executive Committee.  On a weekly basis, our Risk Committee, which consists of the Executive Committee, the Chief Risk Officer and the Chief Financial Officer, reviews all risk exposures, position concentrations and risk-taking activities.  The Global Risk Management Division (the "Division") is independent of the trading areas and reports directly to the Firm's Chief Administrative Officer.  The

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

COMPLAINT

Division includes credit risk management, market risk management, quantitative risk management, sovereign risk management and operational risk management. Combining these disciplines facilitates a fully integrated approach to risk management. The Division maintains staff in each of our regional trading centers as well as in key sales offices. Risk management personnel have multiple levels of daily contact with trading staff and senior management at all levels within the Company. These discussions include reviews of trading positions and risk exposures.

118.    Lehman's Form 10-Ks for fiscal years 2004 and 2006 contained functionally the same, and often identical, disclosures regarding Lehman's mortgage operations, liquidity, and risk management.

119.    Defendants Fuld, as CEO, and O'Meara, as CFO, as required by the securities laws, signed and filed certifications on behalf of themselves and Lehman with the SEC relating to Lehman's FY 2004, 2005 and 2006 Form 10-Ks, which stated that the reports were truthful, the financial statements were accurate and Lehman's internal disclosure and accounting controls were designed to be effective to detect and prevent fraud and had been tested and found to be effective.

**(a)     Lehman's 10-Ks Failed to Disclose Known Trends And Uncertainties.**

120.    Among other deficiencies, Lehman's FY 2004, 2005 and 2006 Form 10-Ks failed to disclose known trends and uncertainties related to its true risk exposure to subprime and Alt-A related assets and to its increased use of leverage, in violation of GAAP and SEC Regulations.

121.    SEC Regulations, Item 7 of Form 10-K and Item 2 of Form 10-Q, Management's Discussion and Analysis of Financial Condition and Results of Operations, require the issuer to furnish information required by Item 303 of Regulation S-K (17 C.F.R. §229.303) ("Item 303"). In discussing results of operations, Item 303 requires the registrant to:

Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

166.    The instructions to Item 303(a) further state:

The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results. . . .

167.    In addition, in its May 18, 1989 Interpretive Release No. 34 26831, the SEC has indicated that registrants should employ the following two-step analysis in determining when a

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

- 31 -
COMPLAINT

1  known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item

2  303:

3      A disclosure duty exists where a trend, demand, commitment, event or uncertainty
       is both presently known to management and reasonably likely to have a material
4      effect on the registrant's financial condition or results of operation.

5      122.    The MD&A requirements are intended to provide, in one section of a filing,

6  material historical and prospective textual disclosure enabling investors and other users to assess

7  the financial condition and results of operations of the registrant, with particular emphasis on the

8  registrant's prospects for the future.  As Concept Release on Management's Discussion and

9  Analysis of Financial Condition and Operations, Securities Act of 1933, Release No.  33-6711,

10  1987 SEC LEXIS 2001, at *6-*7 (Apr.  21,1987), states:

11      The Commission has long recognized the need for a narrative explanation
        of the financial statements, because a numerical presentation and brief
12      accompanying footnotes alone may be insufficient for an investor to judge the
        quality of earnings and the likelihood that past performance is indicative of future
13      performance.  MD&A is intended to give the investor an opportunity to look at
        the company through the eyes of management by providing both a short and long-
14      term analysis of the business of the company.

15      123.    Item 303 states:

16      To the extent that the financial statements disclose material increases in net sales
        or revenues, provide a narrative discussion of the extent to which such increases
17      are attributable to increases in prices or to increases in the volume or amount of
        goods or services being sold or to the introduction of new products or services.
18
        124.    And the instructions to Item 303(a) further state:
19
        Where the consolidated financial statements reveal material changes from year to
20      year in one or more line items, the causes for the changes shall be described to the
        extent necessary to an understanding of the registrant's businesses as a whole . . . .
21
        125.    According to *Management's Discussion and Analysis of Financial Condition and*
22
*Results of Operations*, Securities Act Release No. 6349 (Sept. 28, 1981):
23
        It is the responsibility of management to identify and address those key variables
24      and other qualitative and quantitative factors which are peculiar to and necessary
        for an understanding and evaluation of the individual company.
25

26      126.    Nonetheless, in violation of both GAAP and SEC rules, Lehman's FY 2004 through

27  FY 2008 Form 10-Ks failed to disclose known trends and uncertainties related to Lehman's

28  operations.  The 10-Ks failed to provide any discussion of Lehman's subprime and Alt-A lending

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 32 -
COMPLAINT

activities and provided only a brief discussion concerning its mortgage origination business. In fact, Lehman's public filings did not even include the term "Alt-A" until Lehman filed its Form 10-Q on April 9, 2008 and even that filing was materially misleading because Lehman consolidated its Alt-A holdings with prime holdings into a single category labeled "Alt-A/Prime." Lehman also failed to provide any disclosures concerning the high-risk lending practices engaged in at Aurora and BNC. Lehman further failed to disclose known trends and uncertainties related to its increased use of leverage.

**(b)** **Lehman's 10-Ks Failed To Disclose Its Risk Concentrations.**

127.    Lehman's relevant 10-Ks also failed to disclose its risk concentrations in violation of GAAP. AICPA Statement of Position ("SOP") No. 94-6, Disclosure of Certain Significant Risks and Uncertainties ("SOP 94-6"), requires disclosures specifically relating to risks and uncertainties that could significantly affect the amounts reported in the financial statements in the near term (i.e., one year), particularly from current vulnerability as a result of significant concentrations in certain aspects of the entity's operations. FAS No. 107, Disclosures about Fair Value of Financial Instruments ("FAS 107"), as amended by FAS No. 133, Accounting for Derivative Instruments and Hedging Activities ("FAS 133"), requires disclosure of significant concentrations of credit risk for financial instruments such as loans. FASB Staff Position ("FSP") SOP 94-6-1, Terms of Loan Products That May Give Rise to a Concentration of Credit Risk ("FSP SOP 94-6-1"), addresses disclosure requirements for entities that originate, hold, guarantee, service, or invest in loan products whose terms may give rise to a concentration of credit risk.

128.    Until the filing of its Form 10-Q on July 10, 2008, when Lehman began to provide information concerning its commercial mortgage and real estate investment related portfolios, the required disclosures relating to significant concentrations of credit risk from Lehman's mortgage and real estate-related assets were omitted. From 2004 through mid-2008, Lehman failed to disclose adequately or meaningfully the Company's risk concentrations in, among other things, highly risky Alt-A loans and leveraged loan commitments.[3]

---

[3] Between December 2006 and June 2007, Lehman participated in at least 11 leveraged buyout deals that each exceeded $5 billion; by April 2007, Lehman had a record (approximately 70) high yield contingent commitments; and in June 2007, Lehman's lending pace by dollar

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 33 -

COMPLAINT

129.   In addition, Lehman failed to disclose that it had heavy concentrations of illiquid assets, such as residential and commercial real estate with deteriorating values. These disclosures were especially important beginning in 2006 because the market for mortgage-backed securities and the real estate market had declined.  In fact, an internal Lehman audit report dated February 26, 2007, advised that Lehman "address the main risks in the Firm's portfolio," including "illiquidity" and "concentration of risk."

130.   By failing to disclose material facts about Lehman's concentration of mortgage and real estate-related risks, investors could not meaningfully assess the Company's exposure to the mortgage and real estate markets and the increasing riskiness of Lehman's portfolio of mortgage and real estate assets.

**(c)     Lehman's 10-Ks Provided Misleading Risk Management Disclosures.**

131.   Lehman's 10-Ks also contained misleading disclosures concerning its risk management practices, including, *inter alia*, statements about Lehman's adherence to risk policies, compliance with risk limits, and use of risk mitigants.  Although Lehman consistently promoted its sophisticated and robust risk management system, and claimed Company had engaged in adequate risk management to mitigate its risk to the "greatest extent possible," Lehman regularly disregarded and exceeded its risk limits, or simply raised the limits as Lehman accumulated illiquid assets.  In fact, the Examiner found that Lehman's persistent and repeated failure to adhere to its risk management policies rendered those policies "meaningless," enabled Lehman to acquire billions of dollars of risky investments – and become exposed to billions of dollars of losses – that it would not have been exposed to had it adhered to its risk management limits.  Lehman's statements regarding its risk management system were highly material to investors, including State Fund, because, as an investment bank, risk management was critical to loss prevention.

---

amount had already doubled its 2006 record-setting year for high grade and high yield combined. These concentrations were so large that Lehman's high yield book showed a risk appetite usage that was almost double the limit for these exposures. When the market slowed by the second quarter of 2007, Lehman had approximately $36 billion of contingent commitments on its books. Lehman's public filings failed to disclose this material concentration of risk in leveraged loan deals.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

1       **(d)**     **Lehman's 10-Ks Contained Untrue Statements Regarding Its Liquidity.**

2       132.    Lehman's FY 2004, 2005 and 2006 Forms 10-K also contained untrue statements

3 regarding Lehman's liquidity risk and risk of bankruptcy.  Regulation S-K required Lehman to

4 disclose, in its MD&A, any known commitments "that will result in or that are reasonably likely

5 to result in the registrant's liquidity increasing or decreasing in any material way," and any off-

6 balance sheet arrangements "that have or are reasonably likely to have a current or future effect on

7 the registrant's financial condition . . .results of operations, liquidity, capital expenditures or

8 capital resources that is material to investors."  Lehman's requirement to repurchase the assets

9 covered by the Repo 105 transactions within days of every quarter's end was a known event to

10 Lehman that greatly exceeded the "reasonably likely to occur" standard, as Lehman was in fact,

11 obligated to repurchase the assets, and it was certain to have a material effect on Lehman's

12 financial condition and results of operation.  However, Lehman's statements in the Liquidity,

13 Funding and Capital Resources sections of the MD&A failed to disclose Lehman's obligation to

14 repay the Repo 105 cash borrowings and to repurchase the underlying assets collateralizing the

15 loans immediately after the quarter closed, even though such obligations directly and materially

16 impacted its liquidity.  Lehman's disclosures should have included a discussion of the timing and

17 amounts of the cash flow issues accompanying the repayment of the Repo 105 borrowing,

18 including (1) the amount of cash available after the repayment; (2) the ability to borrow more

19 capital in light of a reduction in debt rating or deterioration in leverage ratio due to the repayment

20 of the Repo 105 borrowing; (3) the effect of the repayment on Lehman's cost of capital/credit

21 rating; and (4) the economic substance and purpose of the Repo 105 arrangements.

22       133.    Lehman's SEC filings throughout the relevant period omitted and misrepresented

23 the foregoing material facts about its repayment of Repo 105 cash borrowings.  Instead, Lehman's

24 10-Ks simply represented that "we maintain a liquidity pool . . . that covers expected cash

25 outflows for twelve months in a stressed liquidity environment."  This statement was false and

26 misleading for failing to disclose Lehman's obligation to repay Repo 105 cash borrowings, which

27 impacted the Company's liquidity pool.

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

134.    Lehman's statements concerning its liquidity were also false and misleading because, as a result of the failure to abide by its risk limits, Lehman had accumulated a heavy concentration of illiquid assets with deteriorating values, such as residential and commercial real estate. Much of Lehman's balance sheet growth (37% during 2007) was attributable to illiquid assets that Lehman was unable to sell without incurring significant losses.

**(3)    Lehman's Other Public Filings Contained Similar False and Misleading Statements and Omissions.**

135.    Lehman's Form 10-Q for the first quarter of 2006, which was incorporated by reference into the Company's Shelf Registration Statement, as well as Lehman's Forms 10-Q filed on October 15, 2004, October 11, 2005, July 10, 2007, and October 10, 2007 – the most recent Forms 10-Q filed before each of State Fund's purchases – contained substantially similar statements concerning the Company's mortgage operations, risk management practices and liquidity. Like the Forms 10-K, the Forms 10-Q failed to identify Aurora or BNC or to mention the terms Alt-A or subprime, and they failed to disclose the risks associated with its real estate-related holdings, including the risks associated with its increased use of leverage. Even when Lehman began to acknowledge some of the risks, it continued to downplay the risks. Moreover, the 10-Qs failed to disclose Lehman's Repo 105 transactions.

136.    Defendants Fuld and O'Meara signed similar certificates contained in the Forms 10-Q attesting to the accuracy of the financial statements and the effectiveness of Lehman's internal disclosure and accounting controls.

137.    Lehman's Form 8-Ks issued just before each of State Fund's purchases in 2005, 2006 and 2007 (i.e., the 12/15/04 8-K, 12/13/05 8-K, 6/12/07 8-K, and 9/18/07 8-K, 12/13/07 8-K) also contained similar misleading statements and omissions.

138.    In fact, on December 13, 2007, Lehman announced positive fourth quarter and year-end 2007 results. Defendant Fuld continued emphasizing the positive results. Later in a conference call, Defendants O'Meara and Callan once again downplayed the effect of the mortgage crisis on Lehman's operations. Further, O'Meara and Callan continued to represent

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

- 36 -
COMPLAINT

1   Lehman's "strong" liquidity position and how Lehman's conservative liquidity framework was

2   structured to cover the Company's funding commitments and cash outflows for a 12-month period.

3      139.   Yet, in January 2008, an internal presentation was made to the Lehman board

4   concerning the real estate crisis and its impact on Lehman.  During the presentation, the Officer

5   and Director Defendants were warned that the Company's liquidity could disappear fast.  The

6   internal analysis questioned "WHY DID WE ALLOW OURSELVES TO BE SO EXPOSED?"

7   The analysis indicated that the "CONDITIONS [WERE] CLEARLY NOT SUSTAINABLE" and

8   that Lehman "SAW WARNING SIGNS" but "DID NOT MOVE EARLY/FAST ENOUGH," and

9   further that the Company lacked "DISCIPLINE ABOUT CAPITAL ALLOCATION."

10      140.   After Bear Stearns Companies Inc. collapsed in March 2008, rumors began

11   circulating that Lehman faced a similar cash crunch, and many Wall Street observers believed

12   Lehman would be the next investment bank failure after Bear Stearns, and, as a result, Lehman

13   stock took a hit.  Nonetheless, defendants denied the rumors and maintained that Lehman

14   remained a strong and viable Company.

15      141.   On March 18, 2008, Lehman again announced positive first quarter 2008 results.

16   During the conference call held the same day, Defendant Callan, went to great lengths to assure

17   investors that Lehman was not in fact going to be the next Bear Stearns and had maintained strong

18   risk management practices which helped to insulate the Company from its Alt-A and subprime

19   exposure.  Callan further maintained the Company had a strong liquidity and capital base:

20          We saw a quarter where our risk management discipline allowed us to
          avoid any single outsize loss.  And it's been our operating philosophy for a
21          decade, which many people are very familiar with, that we remain closely focused
          on our liquidity, our long-term capital position, precisely for the purpose of
22          weathering a difficult market environment that we've seen surfacing in recent
          weeks.  So we're set up for that.
23                            *    *    *
24
          *We had disciplined liquidity and capital management, which we*
25   *consider to be a core competency, and maintained robust liquidity to date*, and
     we've executed close to two-thirds of our full-year capital plan at the end of the
26   first quarter.

27

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

- 37 -

COMPLAINT

\* \* \*

Next, I'd like to review our liquidity position in a different way than we typically do and give you a lot more information. And I'm going to give you information that takes you through the quarter end and actually takes you through end of day yesterday. *And I think that, given the environment we're in, we've tried to add a lot more transparency here, as we've tried to relay the strengths and robustness of the liquidity position of the Firm.*

As we've discussed in the past, we have structured our liquidity framework for a decade to cover expected cash outflows for the next 12 months. And we do so without being able to raise new cash in the unsecured markets, or without having to sell assets that are outside our liquidity pool, and the liquidity pool is comprised of basically cash and cash equivalents. *The framework I'm describing was specifically designed after 1998 and our experiences then, for this type of environment, so I want to be clear about that.*

\* \* \*

Also, for those who saw it, Moody's reaffirmed our A1 credit rating yesterday, with some very good commentary about the strength of the capital base in the franchise and the liquidity.

*So that's a fair amount of color I tried to give you about how we fund ourselves, why we feel comfortable with our liquidity, even absent the fed facility, would feel very comfortable.* The fed facility is a great addition to the equation, and why we think we're in a good position in today's market. So wanted to make sure everybody was fully engaged and had all the information that they needed on that front.

142.    On June 3, 2008, several executives from Lehman's money management subsidiary, Neuberger Berman, sent an email to Lehman's executive committee recommending that Lehman's top management forego bonuses for the year. According to the email, "*Many believe that a substantial portion of the problems at Lehman are structural rather than merely cyclical in nature.*" The executive committee member who was in charge of the Neuberger division responded to the executive committee as follows:

I am not sure what's in the water at 605 Third Avenue today, but Amato and I clearly have some work to do (given the [sic] today's similar emails from Marvin Schwartz, Michael Kaminsky and now Judy).

The compensation issue she raises (Judy Vale and Benjamin Segal on one hand versus Marvin Schwartz and Jeff Bolton on the other) is a particular issue for a small handful of people at Neuberger and hardly worth the EC's time now.

I'm embarrassed and I apologize.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

- 38 -

COMPLAINT

143.    The email was forwarded the same day to defendant Fuld, who responded: "Don't worry-they are only people who think about their own pockets."

144.    On June 9, 2008, Lehman pre-announced its expected second quarter 2008 results, announcing its first quarterly loss since being spun off from American Express. However, defendants maintained the Company had a strong liquidity and capital position. Defendant Fuld stated: "I am very disappointed in this quarter's results. Notwithstanding the solid underlying performance of our client franchise, we had our first-ever quarterly loss as a public company. However, with our strengthened balance sheet and the improvement in the financial markets since March, we are well-positioned to serve our clients and execute our strategy."

145.    On June 12, 2008, Lehman announced that Callan was being replaced as CFO by Ian Lowitt ("Lowitt").

146.    On June 16, 2008, Lehman announced its second quarter 2008 results. According to defendant Fuld:

> "Since we announced our expected second quarter earnings last week, *we have begun to take the necessary steps to restore the credibility of our great franchise and ensure that this quarter's unacceptable performance is not repeated.* We have raised an additional $6 billion of capital. I have asked Bart McDade, our best operator, to serve as the Firm's president and chief operating officer. I have also asked Ian Lowitt, our co-chief administrative officer, to be our chief financial officer. With these actions and our continued commitment to our client-driven franchise, we are positioned to take advantage of opportunities that lie ahead, and we are focused on maximizing shareholder value."

As his predecessors did, newly named CFO Lowitt stated in a conference call in which defendant Fuld participated as follows: "Next, let me review our liquidity position which has never been stronger."

147.    Then, in September 2008, Lehman announced additional billions of dollars in losses and that it would need to raise billions of dollars of additional capital. Thereafter, the price of Lehman securities continued to react adversely as it was disclosed that Lehman was in fact almost insolvent. When it became apparent the federal government would not rescue Lehman, the Company was forced to file Chapter 11 bankruptcy on September 15, 2008, essentially wiping out its equity and debt holders. This was the largest corporate bankruptcy in the history of the United States.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

- 39 -

COMPLAINT

## THE FALSE AND MISLEADING 2007 AND 2008 OFFERING MATERIALS

148.     State Fund purchased its 2007 and 2008 Notes in connection with an offering conducted pursuant to the Shelf Registration Statement, a prospectus dated May 30, 2006 (the "2006 Prospectus"), a prospectus supplement dated May 30, 2006 (the "2006 Prospectus Supplement"), and pricing supplements dated September 19, 2007 (for the 2007 Notes) and January 15, 2008 (for the 2008 Notes).  Under the Shelf Registration Statement, Lehman would be permitted to sell securities described in the subsequently-issued prospectuses in one or more offerings up to a total dollar amount of $2.75 billion.  The 2006 Prospectus stated that it was part of the Shelf Registration Statement.  The pricing supplements for the 2007 and 2008 Notes stated that they supplemented the terms and conditions in, and incorporated by reference, the 2006 Prospectus, as supplemented by the 2006 Prospectus Supplement, and should be read in conjunction with the 2006 Prospectus.  The date of each offering – and not the prior date of the Shelf Registration Statement – was the "effective date" of the Shelf Registration Statement for purposes of Securities Act liability under 17 C.F.R. § 230.415 and 17 C.F.R § 229.512.

149.     The 2006 Prospectus expressly incorporated by reference Lehman's Forms 10-K, 10-Q and 8-K that were filed with the SEC subsequent to the 2006 Prospectus and prior to the date of each offering conducted pursuant to the 2006 Prospectus.  The 2006 Prospectus also incorporated by reference, *inter alia*, the Form 10-K for fiscal year 2005 and Form 10-Q for the first quarter of 2006.  The Shelf Registration, 2006 Prospectus, 2006 Prospectus Supplement, the pricing supplements, as well as all SEC filings incorporated therein, are collectively referred to herein as the "2007 and 2008 Offering Materials."

150.     The 2007 and 2008 Offering Materials were false and misleading because, as described above, they failed to disclose Lehman's Repo 105 transactions, misrepresented Lehman's risk management practices, contained untrue statements regarding Lehman's liquidity risk and risk of bankruptcy, overstated the value of Lehman's commercial real estate holdings, and failed to disclose Lehman's risk concentrations.  In particular, the 2007 and 2008 Offering Materials omitted important information about Lehman's exposure to the subprime and Alt-A markets, including its risky lending practices, and how the changes in the market were affecting

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

- 40 -

COMPLAINT

1  Lehman by the time of the offerings, including omitting information about how this exposure

2  could affect the Company's capital base.  The 2007 and 2008 Offering Materials failed to disclose

3  serious impairments in Lehman's portfolio of subprime mortgage securities and concealed

4  liabilities associated with the marketing of high-risk securities, such as mortgage-backed

5  securities.

6       151.    Moreover, in the months directly preceding the September 2007 offering and

7  January 2008 offering, the Officer Defendants downplayed the Company's exposure to the real

8  estate crisis and provided assurances that Lehman had engaged in proper hedging strategies and

9  other risk management tactics in order to mitigate the Company's exposure.

10       152.    For example, on March 14, 2007, Lehman announced record first quarter 2007

11  results in spite of the growing concerns in the subprime market.  In the press release announcing

12  the first quarter results, defendant Fuld, touting the record results, stated, "[b]y expanding our

13  global footprint, building our capabilities and partnering with our clients, we have again posted

14  record net revenues, net income and earnings per share.  Our results clearly demonstrate that we

15  are better positioned than ever to create value for our clients and our shareholders."

16       153.    Later that same day on a conference call with analysts and investors, defendant

17  O'Meara downplayed the effect the disruption in the subprime market had on Lehman's business.

18  According to O'Meara:

19         Before we move on to our outlook I want to take a minute to discuss
recent market events and provide a bit more color on the topic of mortgages.

20  Recent market adjustments have represented a repricing of risk with a widening of
credit spreads, increased levels of volatility, and pricing adjustments in the equity

21  markets.  Given our diversified business model, parts of our business actually
benefit from wider spreads and higher volatility.  We expect clients to remain

22  active in managing their portfolios through this part of the cycle and we stand
ready to service this activity flow.

23

24         The current dislocations in the subprime mortgage market are consistent
with late cycle trends where credit standards and pricing are lowered to maintain

25  volumes when liquidity is ample.  The situation has clearly been exacerbated by a
wave of early payment defaults and more recently the bankruptcy of a number of

26  monoline subprime mortgage lenders.  *While we are not immune to these events,
we believe we have done a very good job of managing the risks within our*

27  *securitization business including the active hedging strategies we employed to
mitigate our risks.*  This is demonstrated by the fixed income results we have

28  reported today.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

The subprime components of our mortgage business which include origination, securitization, and trading in the U.S. together account for a small portion of our revenues. To put this into perspective, into context, over the past six quarters on average, these businesses, these three businesses all taken together, accounted for less than 3% of our firm-wide revenues. Additionally, our mortgage origination platform is very flexible because of its integration with our mortgage securitization platform in terms of intelligence on deal structure, collateral type, and pricing terms. In the U.S. subprime space, we have adhered to our origination standards. In terms of origination, we remain far more active in the prime and Alt A space which accounted for 75% of our origination volumes in the third quarter.

From a balance sheet perspective, we believe we are well protected. We actively hedged the interest rate and credit components of our inventory positions including our non-investment grade retained interest in securitizations. The majority of which are prime mortgage related. Recent market developments, such as the introduction of single name and index credit derivatives on asset backed products have helped us significantly mitigate our risk. It is important to note at this point, we see the subprime challenges as being a reasonably contained situation. The broader economy is still very strong. Unemployment is low, inflation is in check, and consumer confidence is still strong.

We expect that the U.S. subprime mortgage market will continue to face headwinds in the near term; however, we are now seeing a significant decrease in industry wide capacity in the subprime sector and the beginnings of the return of pricing power. *So we believe we are well positioned to benefit from this evolving situation given our experience in this sector as well as our ample liquidity and risk management practices.* In addition, we expect to see various opportunities as a result of the market dislocations.

Looking forward, although we are expecting continued challenges in part of the U.S. mortgage market, our outlook remains optimistic for the rest of our businesses.

154.    On June 12, 2007, Lehman again announced record results for the second quarter of 2007. Defendants Fuld and O'Meara continued to emphasize the "record" results and the Company's strong liquidity and risk management practices and further continued to downplay Lehman's exposure to the growing troubles in the real estate market.

155.    145.    On July 10, 2007, Lehman filed with the SEC its quarterly report on Form 10-Q for the quarter ended May 31, 2007 ("2Q07 10-Q") (which largely repeated information in its June 12, 2007 Form 8-K) signed by O'Meara. The 2Q07 10-Q reported that Lehman's net leverage ratio was 15.4, which was materially false and misleading because it failed to take into account $31.943 billion in Repo 105 assets that were temporarily removed from Lehman's financial statements. Had the assets that were subject to the Repo 105 transactions been included, Lehman's net leverage ratio would have been 16.9, representing an increase 15 times greater than

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

- 42 -

COMPLAINT

1 Lehman's own materiality threshold of a change in net leverage of 0.1. In addition, the 2Q07 10-

2 Q reported $137.948 billion in securities sold under agreements to repurchase. This statement was

3 materially false and misleading because it excluded almost $32 billion in Repo 105 assets that

4 Lehman had temporarily removed from its balance sheet, which Lehman had agreed to repurchase

5 days after the end of the quarter.

6      156.    On September 18, 2007, Lehman announced positive results for the third quarter of

7 2007 at a time when many of the Company's competitors began to announce massive write-downs

8 and substantial losses, and despite Lehman's announcement that it would be forced to close BNC,

9 its subprime lender. Defendant Fuld remained upbeat concerning Lehman's results and outlook,

10 stating: "Despite challenging conditions in the markets, our results once again demonstrate the

11 diversity and financial strength of the Lehman Brothers franchise, as well as our ability to perform

12 across cycles. . . . We remain focused on delivering significant long term value for our clients and

13 shareholders." Defendant O'Meara in a conference call attributed these strong results to "[o]ur

14 strong risk management culture with regard to the setting of risk limits, and the management of

15 market and counter-party credit risks, and our strong liquidity framework." O'Meara further

16 represented the following concerning Lehman's liquidity:

17        ***Next I would like to discuss our liquidity position, which is now stronger
than ever.*** As we have discussed with you in the past, we have structured our

18        liquidity framework to cover our funding commitments and cash outflows for a
12-month period, without raising new cash in the unsecured markets, or selling

19        assets to generate cash. . . .

20        . . . Our conservative liquidity framework is based on the following
principles: No reliance on short-term unsecured funding, including asset-backed

21        commercial paper. Illiquid assets are funded with long term capital with a
remaining life of 12 months or longer.

22

23      157.    As discussed above, on December 13, 2007, Lehman announced positive fourth

24 quarter and year-end 2007 results. Defendant Fuld continued emphasizing the positive results.

25 Later in a conference call, Defendants O'Meara and Callan once again downplayed the effect of

26 the mortgage crisis on Lehman's operations. Further, O'Meara and Callan continued to represent

27 Lehman's "strong" liquidity position and how Lehman's conservative liquidity framework was

28 structured to cover the Company's funding commitments and cash outflows for a 12-month period.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 43 -

COMPLAINT

158.    On October 10, 2007, Lehman filed with the SEC its quarterly report on Form 10-Q for the quarter ended August 31, 2007 ("3Q07 10-Q") (which largely repeated information in its September 18, 2007 Form 8-K), signed by O'Meara.  The 3Q07 10-Q reported that Lehman's net leverage ratio was 16.1, which was materially misleading because it failed to take into account $36.407 billion in Repo 105 assets that were temporarily removed from Lehman's financial statements. Had the Repo 105 transactions been included, Lehman's net leverage ratio would have been 17.8, representing an increase 17 times greater than Lehman's own materiality threshold of a change in net leverage of 0.1.  In addition, the 3Q07 10-Q reported $169.302 billion in securities sold under agreements to repurchase. This statement was materially false and misleading because it excluded over $36 billion in Repo 105 assets that Lehman had temporarily removed from its balance sheet, which Lehman had agreed to repurchase days after the end of the quarter.

159.    Finally, on December 13, 2007, Lehman hosted a conference call following its earnings release to discuss the Company's fourth quarter and record fiscal 2007 financial results. During the conference call, Defendant O'Meara stated that "[w]e ended the quarter with a net leverage ratio of approximately 16.1 times, in line with last quarter." This statement was false and misleading because in reality Lehman's net leverage ratio was 17.8, an overstatement of 17 basis points, as net assets had been reduced by Lehman's temporary removal of $38.634 billion of assets through Repo 105 transactions that were without economic substance.  During the conference call, O'Meara also stated that the fourth quarter results "reflects the strength of our risk management culture in terms of managing our overall risk appetite, seeking appropriate risk reward dynamics and exercising diligence around risk mitigation."  Defendant Callan also represented that the Company's success was attributable to "our strong risk and liquidity management." These statements were false and misleading because, as set forth above, Lehman disregarded its risk limits and policies on a regular basis. Lehman exceeded its risk appetite limits by $508 million in November, even after having increased the limit; Lehman disregarded the Company's single transaction limit, including committing $10 billion more than the limit had allowed with respect to 24 of its largest high yield deals; the balance sheet limit for Lehman's divisions were exceeded by

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 44 -

COMPLAINT

1  tens of billions – for example, GREG exceeded its balance sheet limit by approximately $3.8

2  billion in 4Q07, and FID exceeded it by $11.17 billion at the end of 4Q07; and VaR limits were

3  breached almost everyday for some of Lehman's divisions, including GREG and High Yield.

4  Additionally, O'Meara stated that the fourth quarter results "reinforce[ed] the importance of our

5  disciplined liquidity and capital management framework which sets us up to operate our business

6  through periods of market stress"; that Lehman's liquidity position "continues to be very strong";

7  that the Company had "structured [its] liquidity framework to cover our funding commitment and

8  cash outflows for a 12 month period without raising new cash in the unsecured markets or selling

9  assets outside our liquidity pool"; and that "[w]e consider our liquidity framework to be a

10  competitive advantage in today's markets." Callan similarly echoed that "we currently have ample

11  liquidity and capital in place." These statements were false and misleading. The Company had

12  significant liquidity concerns due to the illiquid assets it had accumulated as part of its

13  countercyclical growth strategy. In addition, Lehman's true liquidity position was overstated

14  through the use of Repo 105 transactions that were without economic substance.

15       160. Following the December 13, 2007 press release and conference call, analysts James

16  Mitchell and John Grassano from Buckingham continued to rate Lehman a "Strong Buy," stating:

17  "We continue to emphasize LEH's strong risk management abilities (which is enabling them to

18  grab market share)."

19       161. Thus, the 2007 and 2008 Offering Materials, including the public filings

20  incorporated by reference therein, were materially false and misleading.

21             **FRAUDULENT SCHEME AND COURSE OF BUSINESS WITH**

22             **RESPECT TO THE 1934 ACT AND COMMON LAW FRAUD CLAIMS**

23       162. The Officer Defendants are liable for: (i) making false statements; or (ii) failing to

24  disclose adverse facts known to them about Lehman's business and financial results. The Officer

25  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on

26  plaintiff was a success, as it: (i) deceived State Fund regarding Lehman's prospects and business;

27  (ii) artificially inflated the market value of Lehman securities; and (iii) caused State Fund to

28  purchase Lehman securities at prices far exceeding their true worth.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

- 45 -

COMPLAINT

163.   In particular, the true facts, which were known by the Officer Defendants but concealed from State Fund during the relevant period, were as follows:

(a)   Lehman's true exposure to risk from mortgage-related transactions and assets was understated.

(b)   Lehman's subsidiaries, BNC and Aurora, were engaging in high-risk residential mortgage lending practices, which resulted in mortgage loans that would be much more likely to end up defaulting and causing losses.

(c)   Lehman failed to properly mitigate the risks associated with Lehman's mortgage financing activities.

(d)   Lehman violated GAAP in preparing and disseminating false and misleading financial statements with respect to its accounting for mortgage-related assets.

(e)   Lehman was engaging in quarter-end accounting manipulations that understated its debt in quarterly financial statements by billions of dollars.

(f)   The extent of Lehman's leverage exposure was misstated.

(g)   Lehman represented that all of Lehman's assets were presented at "fair value." Lehman, however, failed to consider market information when valuing certain of its commercial real estate assets, thereby materially overstating their value.

(h)   Lehman's internal controls were inadequate to prevent the Company from engaging in risky lending practices.

(i)   The Company's capital base was not adequate enough to withstand the significant deterioration in the real estate markets, and, as a result, Lehman would be forced to file for bankruptcy protection due to its subprime and Alt-A exposure.

## STATE FUND REASONABLY RELIED ON DEFENDANTS' FALSE
## AND MISLEADING STATEMENTS

164.   State Fund relied on the supposed truthfulness and accuracy of Defendants' public statements, as detailed above, prior to purchasing the 2005, 2006, 2007, and 2008 Notes.

165.   As State Fund's investment adviser/portfolio manager, Conning manages the day-to-day investment decisions for State Fund. Prior to purchasing Lehman notes on State Fund's

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

- 46 -

COMPLAINT

1    behalf, Conning would, as a matter of practice, review the most recent Lehman public filings

2    available as well as analyst reports discussing Lehman or the specific security.

3    166.    When Conning purchased the 2005 Notes on State Fund's behalf, the most recent

4    public filings available from Lehman included the October 15, 2004 Form 10-Q and December 15,

5    2004 Form 8-K.  The documents reviewed by Conning were false and misleading because, inter

6    alia, they failed to disclose Lehman's (1) high-risk, deceptive lending practices in originating

7    subprime and Alt-A loans; (2) substantial increase in its use of leverage to fund its real estate

8    investment activities; and (3) accounting treatment and use of Repo 105 transactions.

9    167.    When Conning purchased the 2006 Notes on State Fund's behalf, the most recent

10   public filings available from Lehman included Lehman's FY 2004 Form 10-K/A, October 11,

11   2005 Form 10-Q, and December 13, 2005 Form 8-K.  The documents reviewed by Conning were

12   false and misleading because, *inter alia*, they failed to disclose Lehman's (1) high-risk, deceptive

13   lending practices in originating subprime and Alt-A loans; (2) substantial increase in its use of

14   leverage to fund its real estate investment activities; and (3) accounting treatment and use of Repo

15   105 transactions.

16   168.    When Conning purchased the 2007 Notes on State Fund's behalf, the most recent

17   public filings available from Lehman included Lehman's FY 2005 and 2006 Forms 10-K, July 10,

18   2007 Form 10-Q, September 18, 2007 Form 8-K, and June 12, 2007 Form 8-K.  As detailed

19   above, the 2007 Offering Materials contained numerous materially false and misleading

20   statements and omissions.

21   169.    When Conning purchased the 2008 Notes on State Fund's behalf, the most recent

22   public filings available from Lehman included Lehman's FY 2005 and 2006 Forms 10-K, June 12,

23   2007 Form 8-K, July 10, 2007 Form 10-Q, September 18, 2007 Form 8-K, October 10, 2007 Form

24   10-Q, and December 13, 2007 Form 8-K.  As detailed above, the 2008 Offering Materials also

25   contained numerous materially false and misleading statements and omissions.

26   170.    Had Conning or State Fund read a truthful account of Lehman's creditworthiness

27   and underlying business activities alleged herein, Conning and State Fund would not have decided

28   to purchase the 2005, 2006, 2007, and 2008 Notes.  Disclosure of the true financial condition of

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 47 -

COMPLAINT

1   Lehman and its high-risk activities would have indicated to Conning and State Fund that any

2   investment in the 2005, 2006, 2007, and 2008 Notes posed an exceedingly high risk of being

3   rendered worthless without adequate compensation to the investor for this heightened risk.

4       171.    Conning and State Fund reasonably and justifiably relied on Defendants' false and

5   misleading statements in deciding to purchase the 2005, 2006, 2007, and 2008 Notes.  Conning

6   and State Fund were ignorant of the truth concerning Defendants' wrongful conduct, as detailed

7   above, and believed the false and misleading statements to be complete and truthful.  Had Conning

8   and State Fund known of the truth concerning Lehman's business practices, they would not have

9   decided to purchase the 2005, 2006, 2007, and 2008 Notes.

10                      **LOSS CAUSATION/ECONOMIC LOSS**

11      172.    Between February 2005 and January 2008, the market value of the 2005, 2006,

12  2007, and 2008 Notes was artificially inflated as a result of the material misrepresentations and

13  omissions set forth above.  The artificial inflation was removed through a series of partial

14  disclosures and the materialization of previously concealed risks.

15      173.    On June 9, 2008, Lehman issued a press release announcing its financial results for

16  its second quarter of 2008, ended May 31, 2008.  Despite having previously announced success

17  with its delevering plan, its strong liquidity position, that it had risk management policies in place

18  and that its assets were fairly valued, the press release disclosed that Lehman took $4 billion in

19  mark-to-market write-downs, including $2.4 billion in residential mortgage related holdings, $700

20  million in commercial positions, and $300 million in real estate held for sale.  In addition, the

21  Company announced that it would raise $6 billion through a combined offering of preferred and

22  common shares.  In addition, rating agencies Fitch and Moody's downgraded Lehman's credit

23  rating.  However, the June 9, 2008 announcement only partially revealed the truth, and Lehman

24  continued to misrepresent its financial condition.

25      174.    On September 8, 2008, Lehman announced that it would release its third quarter

26  2008 results and key strategic initiatives for the Company on September 18, 2008.  Analysts at

27  Bernstein Research and Oppenheimer predicted further write-downs in the third quarter of

28  between $4 and $5 billion.  In addition, there were market reports of Lehman's potential sale of

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 48 -
COMPLAINT

1   assets to raise capital, which market commentators said smacked of desperation and indicated

2   problems with Lehman's liquidity position.

3        175.   On September 9, 2008, there were market reports that Lehman's attempts to obtain

4   a capital infusion from the Korea Development Bank had failed, leading to concerns that "no one

5   will inject capital" into Lehman.  In addition, S&P and Fitch both placed their ratings on Lehman

6   on review for downgrade.  S&P specifically cited concerns about Lehman's ability to raise capital.

7        176.   On September 10, 2008, Lehman reported a $3.9 billion loss for the third quarter of

8   2008, as well as $7 billion in gross write-downs on its residential and commercial real estate

9   holdings, despite having previously announced success with its delevering plan, its strong liquidity

10  position, that it had risk management policies in place and that its assets had been fairly valued.  In

11  announcing the results during the conference call, Lowitt, having replaced Callan as CFO, also

12  disclosed that "[t]he majority of our write-downs were in Alt-A driven by increase in Alt-A

13  delinquencies and loss expectations which were specific to Alt-A prices and did not affect the

14  performance of our hedges."  Contrary to Defendants' earlier statements, Lowitt admitted that

15  "unfortunately there is no direct hedge for Alt-A assets."  In addition, Fitch and Dunn & Bradstreet

16  downgraded Lehman's credit rating.

17       177.   On September 15, 2008, Lehman filed for bankruptcy protection because it had

18  "significant liquidity problems."

19       178.   The disclosures regarding Lehman's massive write-downs and liquidity problems

20  (which led to Lehman's bankruptcy) revealed the truth about Lehman's financial condition.  As a

21  result of these disclosures and resulting bankruptcy, the market value of State Fund's 2005, 2006,

22  2007, and 2008 Notes declined to pennies on the dollar.

23       179.   As set forth above, as a direct result of Lehman's failure to abide by its risk limits

24  and risk management policies, Lehman acquired tens of billions of dollars of highly risky, illiquid

25  assets that ultimately required enormous write-downs and triggered the liquidity crisis that ended

26  Lehman's existence.  During the relevant period, in order to conceal the problems with its balance

27  sheet, and in particular the amount of troubled assets it held, Lehman engaged in tens of billions of

28  dollars worth of Repo 105 transactions in order to temporarily remove assets from its balance

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 49 -

COMPLAINT

1  sheet solely for reporting purposes.  Through these sham transactions, Lehman artificially reduced

2  its net leverage ratio, fraudulently preserved its credit ratings, and created the appearance that

3  Lehman was more capitalized and liquid than it really was.

4       180.    The declines in the market value of Lehman securities and resulting losses are

5  directly attributable to the disclosure of information and materialization of risks that were

6  previously misrepresented or concealed by the Officer Defendants.  Had State Fund known of the

7  material adverse information not disclosed by the Officer Defendants or been aware of the truth

8  behind their material misstatements, they would not have purchased Lehman securities at

9  artificially inflated prices.

10  **NO SAFE HARBOR**

11       181.    Defendants' verbal "Safe Harbor" warnings accompanying Lehman's oral forward-

12  looking statements ("FLS") issued during the relevant period were ineffective to shield those

13  statements from liability.

14       182.    The Defendants are also liable for any false or misleading FLS pleaded because, at

15  the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

16  authorized and/or approved by an executive officer of Lehman who knew that the FLS was false.

17  None of the historic or present tense statements made by Defendants were assumptions underlying

18  or relating to any plan, projection or statement of future economic performance, as they were not

19  stated to be such assumptions underlying or relating to any projection or statement of future

20  economic performance when made, nor were any of the projections or forecasts made by

21  Defendants expressly related to or stated to be dependent on those historic or present tense

22  statements when made.

23  **COUNT I**

24  **For Violation of §10(b) of the 1934 Act and Rule 10b-5**
25  **Against Officer Defendants**

26       183.    Plaintiff incorporates by reference each and every allegation contained in

paragraphs 1 through 182, inclusive, except for those allegations disclaiming any attempt to allege

27  fraud, and further alleges as follows:

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

- 50 -

COMPLAINT

184. As specified above the Officer Defendants disseminated or approved false statements that they knew, or deliberately disregarded knowing, were misleading in that they contained affirmative misrepresentations and failed to disclose material facts necessary in order to make statements not misleading.

185. The Officer Defendants, individually and/or in concert, by use of means or instrumentalities of interstate commerce and/or of the United States mail, violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they: (1) employed devices, schemes and artifices to defraud; (2) made untrue statements of material facts and/or omitted material facts necessary to make the statements made not misleading in light of the circumstances under which they were made; (3) deceived the investing public, including State Fund; (4) artificially inflated the market value of Lehman 2007 Notes; and (5) caused State Fund to purchase Lehman 2007 and 2008 Notes at artificially inflated prices and suffer losses.

186. The Officer Defendants were primary participants in the wrongful, illegal conduct charged herein.

187. Each of the Officer Defendants was a top officer and controlling person of Lehman and had direct involvement in its operations and activities. The materially misstated information presented in group-published documents, including the 2007 and 2008 Offering Materials, was the collective action of these Defendants. These Defendants were each involved in drafting, producing, reviewing and/or disseminating the group-published documents at issue in this action during their tenure with the Company.

188. Each of the Officer Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though they were readily available to them.

189. The Officer Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Lehman's financial condition and results of operations, business practices and future business prospects from the investing public and supporting the artificially-inflated market value of its securities.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

- 51 -
COMPLAINT

190.    As a direct and proximate result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market value of the 2007 and 2008 Notes was artificially inflated and caused loss to State Fund, which purchased the 2007 and 2008 Notes in reliance on the accuracy of the 2007 and 2008 Offering Materials and the integrity of the market.  State Fund suffered losses when the market value of the Lehman 2007 and 2008 Notes fell in response to the issuance of corrective disclosures and/or the materialization of risks previously concealed by the Officer Defendants.  State Fund would not have purchased the Lehman Bonds at the prices paid, or at all, if the true facts concerning Lehman's operations had been disclosed in the 2007 and 2008 Offering Materials.

## **COUNT II**

### **For Violation of §20(a) of the 1934 Act Against Officer Defendants**

191.    Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 190, inclusive, except for those allegations disclaiming any attempt to allege fraud, and further alleges as follows:

192.    The Officer Defendants were and acted as controlling persons of Lehman within the meaning of Section 20(a) of the 1934 Act.  By virtue of their high-level positions with Lehman, their ownership of Lehman securities, their participation in and/or awareness of Lehman's day-to-day operations, and/or their intimate knowledge of Lehman's actual performance or true position, the Officer Defendants had, and exercised, power and authority to influence and control, indirectly or directly, the decision-making of Lehman, including the content and dissemination of the false and misleading statements alleged herein.

193.    Each of the Officer Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the false statements and material omissions or cause such misleading statements and omissions to be corrected.  Additionally, Defendant Fuld, through his position as CEO, controlled Defendant O'Meara.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 52 -
COMPLAINT

194.     The Officer Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged herein.  Due to their status as controlling persons over Lehman and of Lehman insiders, the Officer Defendants are each liable pursuant to Section 20(a) of the 1934 Act having culpably participated in the fraud.

195.     As a direct and proximate result of the Officer Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases of the Lehman 2007 and 2008 Notes.

## COUNT III

**For Violation of §11 of the 1933 Act**
**Against All Defendants**

196.     Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 195, inclusive, except any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  This Count is based on negligence and strict liability and does not sound in fraud.

197.     This Count is brought for violations of Section 11 of the 1933 Act.

198.     The Shelf Registration Statement, including the 2007 and 2008 Offering Materials incorporated by reference therein, for the Lehman 2007 and 2008 Notes was inaccurate and misleading, contained untrue statements of material facts, and omitted facts necessary to make affirmative statements not misleading.

199.     The Officer Defendants were executive officers and representatives of the Company responsible for the contents and dissemination of the Shelf Registration Statement. Each of the Director Defendants was a director of Lehman at the time the Shelf Registration Statement became effective as to the 2007 and 2008 Notes offerings.  The Officer Defendants signed the Shelf Registration Statement, or documents incorporated by reference, and caused and participated in the issuance of the Shelf Registration Statement.  By reasons of the conduct alleged herein, each of these Defendants violated Section 11 of the 1933 Act.

200.     The Underwriter Defendants were underwriters of the offerings conducted pursuant to the Shelf Registration Statement through which State Fund purchased the 2007 and 2008 Notes. The Underwriter Defendants acted negligently, were responsible for the contents and

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 53 -

COMPLAINT

1   dissemination of the Shelf Registration Statement, including the documents incorporated by

2   reference therein (*i.e.*, the 2007 and 2008 Offering Materials), and did not perform adequate due

3   diligence.

4          201.     Defendants named in this Count owed to plaintiff the duty to make a reasonable

5   and diligent investigation of statements contained in the Registration Statement and any

6   incorporated documents, at the time the offering became effective to ensure that said statements

7   were true and that there were no omissions of material fact that rendered the statements therein

8   materially untrue or misleading.  None of the Defendants made a reasonable investigation or

9   possessed reasonable grounds to believe that the statements contained in the Shelf Registration

10  Statement were true, were without omissions of any material facts, and were not misleading.

11  Accordingly, Defendants acted negligently and are liable to Plaintiff.

12         202.     Plaintiff purchased the Lehman 2007 and 2008 Notes pursuant to – and in reliance

13  upon – the materially false and misleading Shelf Registration Statement and documents

14  incorporated therein.

15         203.     At the time of said purchase, Plaintiff did not know of the negligent conduct or of

16  the facts concerning the untruths alleged herein, and by reasonable exercise of care could not have

17  reasonably discovered such facts or conduct.

18         204.     None of the untrue statements or omissions alleged herein was a forward-looking

19  statement but, rather, each concerned existing facts.

20         205.     Plaintiff has been damaged by Defendants' conduct.  The market value of the 2007

21  and 2008 Notes purchased by Plaintiff pursuant to the offering, and later sold by Plaintiff, declined

22  substantially due to Defendants' violations of Section 11 of the 1933 Act.

23  <u>**COUNT IV**</u>

24  **For Violation of §12(a)(2) of the 1933 Act**<br>**Against All Defendants**

25

26         206.     Plaintiff incorporates by reference each and every allegation contained in

27  paragraphs 1 through 205, inclusive, except any allegations of fraud or fraudulent conduct and/or

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 54 -

COMPLAINT

1 motive are specifically excluded from this cause of action. This cause of action is based on

2 negligence and strict liability and does not sound in fraud.

3      207.    This cause of action is brought for violations of Section 12(a)(2) of the 1933 Act.

4 The 2007 and 2008 Offering Materials for the 2007 and 2008 Notes were inaccurate and

5 misleading, contained untrue statements of material facts, and omitted facts necessary to make

6 affirmative statements not misleading.

7      208.    Defendants charged with this cause of action owed Plaintiff, who purchased the

8 Lehman 2007 and 2008 Notes pursuant to the 2007 and 2008 Offering Materials, the duty to make

9 a reasonable and diligent investigation of the statements contained therein.

10      209.    Defendants, in the exercise of reasonable care, should have known of the untruths

11 of the 2007 Offering Materials as alleged herein.

12      210.    Plaintiff did not know, nor in the exercise of reasonable diligence could have

13 known, of the untruths and omissions contained in the 2007 and 2008 Offering Materials at the

14 time Plaintiff acquired the Lehman 2007 and 2008 Notes.

15      211.    Accordingly, Defendants violated Section 12(a)(2) of the 1933 Act. As a direct and

16 proximate result of the violations, Plaintiff sustained damages on its purchases of the Lehman

17 2007 and 2008 Notes pursuant to the 2007 and 2008 Offering Materials. Thus, Plaintiff has the

18 right to rescind and recover the consideration paid for the Lehman 2007 and 2008 Notes, and/or is

19 entitled to other damages.

20 **COUNT V**

21 **For Violation of §15 of the 1933 Act**
**Against Officer Defendants**

22

23      212.    Plaintiff incorporates by reference each and every allegation contained in

paragraphs 1 through 211, inclusive, except any allegations of fraud or fraudulent conduct and/or

24 motive are specifically excluded from this cause of action. This Count is based on negligence and

25 strict liability and does not sound in fraud.

26      213.    This Count asserts violations of Section 15 of the 1933 Act, on behalf of Plaintiff

27 who purchased the Lehman 2007 and 2008 Notes pursuant to the 2007 and 2008 Offering

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 55 -

COMPLAINT

1  Materials.  Each of the Officer Defendants was a controlling person of Lehman within the

2  meaning of Section 15 of the 1933 Act, by virtue of their positions as executive officers and/or

3  directors of Lehman prior to and at the time of the offering.

4  214.    Officer Defendants at all relevant times participated in the operation and

5  management of Lehman, and conducted and participated in Lehman's day-to-day affairs.

6  215.    Officer Defendants had a duty to disseminate accurate and truthful information

7  with respect to Lehman's financial condition and results of operations.

8  216.    By virtue of their positions, Officer Defendants had the ability to, and did, control

9  the contents of the 2007 and 2008 Offering Materials referenced herein, which, as alleged,

10  contained materially untrue financial information.

11  217.    By reason of the aforementioned conduct, each Officer Defendant is liable under

12  Section 15 of the 1933 Act, jointly and severally, to Plaintiff.  As a direct and proximate result of

13  Officer Defendants' conduct, Plaintiff suffered damages in connection with its acquisition of the

14  Lehman 2007 and 2008 Notes.

## COUNT VI

### For Violation of California Corporations Code §§ 25400, 25500
### Against Officer Defendants

218.    Plaintiff incorporates by reference each and every allegation contained in

paragraphs 1 through 217, inclusive.

219.    California Corporations Code Section 25400, subsection (d), prohibits the making

of a material misrepresentation or misleading omission in the sale of a security in order to induce

the transaction.  California Corporations Code Section 25500 creates the private remedy for

violations of Section 25400.

220.    The Lehman 2007 and 2008 Notes constitute "securities" as defined in California

Corporations Code Section 25019.

221.    As alleged herein, the Officer Defendants violated California Corporations Code

Section 25400 in that they made or caused to be made misrepresentations or misleading omissions

as to Lehman's balance sheet, leverage, repo financing, financial results, and liquidity position.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership including
Professional Corporations

2431882.1  10

- 56 -

COMPLAINT

1      222.    The Officer Defendants knew that the representations as to Lehman's balance

2   sheet, leverage, repo financing, financial results, and liquidity position were false.

3      223.    The Officer Defendants made the misrepresentations with the intent to induce

4   Plaintiff, and other market participants, to purchase, invest or otherwise acquire the Lehman 2007

5   and 2008 Notes.

6      224.    The underlying problems at Lehman concealed by the Officer Defendants'

7   misrepresentations and omissions were the proximate cause of Lehman's collapse and Plaintiff's

8   resulting damages.

9      225.    As a result of the Officer Defendants' misrepresentations, Plaintiff has been

10   damaged and, pursuant to California Corporations Code Section 25500, is entitled to appropriate

11   damages and/or remedies.

12                          **COUNT VII**

13          **For Violation of California Corporations Code §§ 25401, 25501**
                          **Against All Defendants**
14
15      226.    Plaintiff incorporates by reference each and every allegation contained in

16   paragraphs 1 through 225, inclusive.

17      227.    California Corporations Code Section 25401 prohibits selling a security in

18   California by means of a  material misrepresentation or misleading omission.  California

19   Corporations Code Section 25501 creates the private remedy for violations of Section 25401.

20      228.    The Lehman 2007 and 2008 Notes constitute "securities" as defined in California

21   Corporations Code Section 25019.

22      229.    As alleged herein, the Defendants violated California Corporations Code Section

23   25401 in that they sold or otherwise made available the Lehman 2007 and 2008 Notes by means of

24   material misrepresentations or misleading omissions in the 2007 and 2008 Offering Materials

25   regarding Lehman's balance sheet, leverage, repo financing, financial results, and liquidity

26   position

27

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

- 57 -

COMPLAINT

230.     The Defendants knew, or by the exercise of reasonable care could have known, that the representations regarding Lehman's balance sheet, leverage, repo financing, financial results, and liquidity position were false.

231.     The Defendants made the representations for the purpose of inducing Plaintiff, and other market participants, to purchase, invest or otherwise acquire the Lehman 2007 and 2008 Notes.

232.     The underlying problems at Lehman concealed by Defendants' misrepresentations and omissions were the proximate cause of Lehman's collapse and Plaintiff's resulting injury.

233.     As a result of the false and misleading 2007 and 2008 Offering Materials, Plaintiff has been damaged and, pursuant to California Corporations Code Section 25501, is entitled to appropriate damages and/or remedies.

## COUNT VIII

### For Violation of California Corporations Code §25504
### Against Officer Defendants

234.     Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 233, inclusive.

235.     The Officer Defendants at all relevant times participated in the operation and management of Lehman, and conducted and participated in Lehman's day-to-day affairs.  By virtue of their positions, the Officer Defendants had the ability to, and did, control the contents of the 2007 Offering Materials referenced herein, which, as alleged, contained material untruths.  By virtue of their positions as executive officers and/or directors of Lehman prior to and at the time of the offerings at issue in this Complaint, each of the Officer Defendants was a controlling person of Lehman within the meaning of California Corporations Code Section 25504.

236.     Each of the Officer Defendants materially aided in the preparation and dissemination of the misstatements alleged herein.

237.     By reason of the aforementioned conduct, each Officer Defendant is liable under California Corporations Code Section 25504, jointly and severally, to Plaintiff for violations of

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

1  California Corporations Code Section 25401 and 25501.  As a direct and proximate result of

2  defendants, Plaintiff suffered damages on their purchase of the Lehman 2007 and 2008 Notes.

3  <u>**COUNT IX**</u>

4  **For Violation of California Corporations Code §25504.1**
   **Against Officer Defendants**

5

6  238.    Plaintiff incorporates by reference each and every allegation contained in

   paragraphs 1 through 237, inclusive.

7

8  239.    During the relevant period, the Officer Defendants materially assisted in violations

   of California Corporations Code Section 25401.  The Officer Defendants made or caused to be

9

10 made material misrepresentations and misleading omissions in filings and offerings as alleged

   herein.  In so doing, the Officer Defendants misled investors regarding Lehman's balance sheet,

11

12 leverage, repo financing, financial results, and liquidity position.

   240.    The Officer Defendants made the misrepresentations and omissions with intent to

13

14 deceive Plaintiff and other market participants, and with intent to induce investments thereby.

   241.    Plaintiff, at all relevant times, was ignorant of the misrepresentations and

15

16 omissions, and relied on Lehman's representations as if true.

   242.    Each of the defendants is jointly and severally liable for the disseminated untruths.

17

18 243.    As a direct and proximate result of these unlawful acts, Plaintiff has been harmed in

   an amount to be proven at trial.

19

20 <u>**COUNT X**</u>

21 **For Common Law Fraud**
   **Against Officer Defendants**

22 244.    Plaintiff incorporates by reference each and every allegation contained in

23 paragraphs 1 through 243, inclusive, except for those allegations disclaiming any attempt to allege

24 fraud, and further alleges as follows:

25 245.    This cause of action asserts common law fraud claims in connection with Plaintiff's

26 purchases of the Lehman 2005, 2006, 2007, and 2008 Notes, based on material misrepresentations

27 and omissions made by the Officer Defendants and relied upon by Plaintiff, or Plaintiff's agent, in

28 connection with purchases of such securities.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership including
Professional Corporations
2431882.1 10

COMPLAINT

246.    As described above, the Officer Defendants knew or recklessly disregarded the untrue or misleading nature of statements made in public filings preceding each of State Fund's purchases of Lehman notes – including Lehman's filings on Forms 10-K, 10-Q, and 8-K referenced above for fiscal years 2004 through 2007 – regarding Lehman's balance sheet, leverage, repo financing, financial results, and liquidity position.

247.    The true facts, which were known by the Officer Defendants but concealed from State Fund during the relevant period, were as follows:

(a)    Lehman's true exposure to risk from mortgage-related transactions and assets was understated.

(b)    Lehman's subsidiaries, BNC and Aurora, were engaging in high-risk residential mortgage lending practices, which resulted in mortgage loans that would be much more likely to end up defaulting and causing losses.

(c)    Lehman failed to properly mitigate the risks associated with Lehman's mortgage financing activities.

(d)    Lehman violated GAAP in preparing and disseminating false and misleading financial statements with respect to its accounting for mortgage-related assets.

(e)    Lehman was engaging in quarter-end accounting manipulations that understated its debt in quarterly financial statements by billions of dollars.

(f)    The extent of Lehman's leverage exposure was misstated.

(g)    Lehman represented that all of Lehman's assets were presented at "fair value." Lehman, however, failed to consider market information when valuing certain of its commercial real estate assets, thereby materially overstating their value.

(h)    Lehman's internal controls were inadequate to prevent the Company from engaging in risky lending practices.

(i)    The Company's capital base was not adequate enough to withstand the significant deterioration in the real estate markets, and, as a result, Lehman would be forced to file for bankruptcy protection due to its subprime and Alt-A exposure.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 60 -
COMPLAINT

248.     All of the Officer Defendants' misrepresentations and omissions concerned facts that were peculiarly within the knowledge of defendants and that were not readily available to Plaintiff.  As the Officer Defendants knew, as a result of their misrepresentations and omissions, Plaintiff was acting under mistaken beliefs about these material facts.  The Officer Defendants breached their duty by failing to disclose the truth to Plaintiff.

249.     At the time the Officer Defendants caused these false and misleading statements to be made, they did not believe them to be true and caused them to be made without regard for the truth.

250.     The Officer Defendants sometimes deceived Plaintiff through partial or ambiguous statements that non-public information available to the Officer Defendants rendered materially misleading.  The Officer Defendants breached their duty by failing to disclose that information to Plaintiff and instead painting a different picture.

251.     The Officer Defendants intended that investors, including Plaintiff and Plaintiff's agent, rely on these false and misleading statements.  The Officer Defendants intended and reasonably expected that their misrepresentations and omissions would cause Plaintiff to make, retain or increase its Lehman holdings, desist from further inquiry and remain passive. As a result of the misrepresentations and omissions alleged in this Complaint, Plaintiff lost the opportunity to investigate Lehman's problems and to evaluate the steps, if any, the Officer Defendants were taking to try to address them.

252.     As a result of these misrepresentations and omissions, the Officer Defendants deceived Plaintiff regarding Lehman's true financial condition causing Plaintiff to purchase the 2005, 2006, 2007, and 2008 Notes.

253.     Plaintiff increased its investment in Lehman, including through purchases of the 2005, 2006, 2007, and 2008 Notes, and retained its existing investment in Lehman in justifiable reliance on the Officer Defendants' fraudulent misrepresentations and omissions.

254.     Plaintiff, or Plaintiffs' agent, at the time the above-described representations were made, was ignorant of the misrepresentations and omissions, and believed Lehman's SEC filings and oral communications to be true.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1 10

- 61 -

COMPLAINT

255.   The underlying problems at Lehman concealed by the Officer Defendants' misrepresentations and omissions were the direct and proximate cause of Lehman's collapse and Plaintiff's resulting damage.

256.   By virtue of the material misrepresentations and omissions alleged herein, the Officer Defendants are liable to Plaintiff for damages for actual and/or constructive fraud under the common law of the State of California in an amount to be determined at trial.

257.   In doing the acts alleged herein, the Officer Defendants acted with malice, oppression and fraud, and Plaintiff is entitled to punitive and exemplary damages in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:  An aware of damages, in an amount to be proven a trial, but including at minimum:

A.   Compensatory damages according to proof at trial;

B.   Pre-judgment and post-judgment interest, and reasonable attorney and expert witness fees and other costs;

C.   Rescission and/or rescission damages;

D.   Exemplary and/or punitive damages as to counts for which they are available under applicable law in such amount as the Court deems just and proper; and

E.   Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  May 16, 2011

Respectfully submitted,

IRELL & MANELLA LLP
John C. Hueston

By: _____
John C. Hueston

Attorneys for Plaintiff State
Compensation Insurance Fund

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

2431882.1  10

- 62 -
COMPLAINT